Lillian D. **DUDLEY**, Pro Se, Clara L. **Robertson, Aurelia Hart, Kumasi Mants, Lola Nowden, Melba Jean Easter, Caroline Glover, Twalla McCree, Calandra J. Cherry, Charlotte Hardy, Corey Crawford, Terri Howard–Stallworth, Stephanie Shields, Plaintiffs,**

v.

**WAL–MART STORES, INC., Defendant.**

**Civil Action Nos. 94–D–508–N, 94–D–531–N, 94–D–610–N, 94–D–629–N to 94–D–632–N, 94–D–638–N, 94–D–642–N, 94–D–643–N, 94–D–649–N, 94–D–650–N and 94–D–656–N.**

United States District Court,
M.D. Alabama,
Northern Division.

April 10, 1996.

---

779

Lillian D. Dudley, Montgomery, AL, pro se.

Lucie U. McLemore and Kenneth W. Underwood, Jr., Montgomery, AL, for Clara L. Robertson, Aurelia Hart, Kumasi Mants, Lola Nowden, Melba Jean Easter, Caroline Glover, Twalla McCree, Calandra J. Cherry,

Charlotte Hardy, Corey Crawford, Terri Howard–Stallworth, Stephanie Shields, Yetta Ellis and Winston S. Smith.

Charles A. Powell, III, John W. Sheffield, Barry V. Frederick, William Kennedy Hancock, David W. Proctor, William G. Somerville, III, Spencer A. Kinderman, and Jennifer F. Swain, Johnston, Barton, Proctor & Powell, Birmingham, AL, for Wal–Mart Stores, Inc.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

This cause is now before the court on twelve motions for summary judgment filed by the defendant, Wal–Mart Stores, Inc. ("Wal–Mart").[1] The plaintiffs in this consolidated action are either current or former employees of Wal–Mart store # 930 located in Montgomery, Alabama. The plaintiffs allege that Wal–Mart discriminated against them on the basis of race by breaching the terms and conditions of their employment, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.[2]

Because Wal–Mart's motions involve similar legal issues and facts, the court will address the motions simultaneously. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court issues the following memorandum opinion.

### JURISDICTION

Based upon 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 2000e–5(f)(3), the court properly exercises subject matter jurisdiction over this action. The parties do not contest personal jurisdiction or venue.

Additionally, under Title VII and the Equal Employment Opportunity Commission's ("EEOC") regulations, a plaintiff must satisfy two jurisdictional requirements before

---

1. Also pending before the court is Wal–Mart's motion for summary judgment as to the claims asserted by *pro se* plaintiff Lillian D. Dudley. The court will address the merits of this motion in a separate opinion.

Some of the plaintiffs also filed a motion for preliminary injunction and assert that, after fil-

ing this lawsuit, Wal–Mart retaliated against them in violation of Title VII. A ruling on this motion will be forthcoming.

2. One plaintiff, Caroline Glover, brings an additional claim for sex discrimination in violation of Title VII.

784

filing a complaint in federal court. The court finds that all plaintiffs, except Calandra Cherry and Caroline Glover, discussed *infra*, (1) timely filed a charge of discrimination with the EEOC and, (2) after receiving right-to-sue letters from the EEOC, timely instituted this action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973).

## SUMMARY JUDGMENT STANDARD

■ On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

■ The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

■ In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587, 106 S.Ct. at 1356; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

## DISCUSSION

### *I. Legal Standard*

■ The plaintiffs bring their discrimination claims under Title VII and/or § 1981, both of which prohibit racial discrimination in employment. Because both statutes require a showing of intentional discrimination, courts apply the same test for analyzing claims under Title VII and § 1981. *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994) ("[T]he allocation of burdens under Title VII applies to proving in-

tentional discrimination under section 1981 as well.") (citation omitted).

■ In an action alleging disparate treatment under Title VII, a plaintiff must prove an intentional discriminatory motive by presenting either direct or circumstantial evidence. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519–21, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993); *see e.g., Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 771–72 (11th Cir.1982). Absent direct evidence, a plaintiff can establish intentional discrimination under the three-part burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Under the *McDonnell Douglas* and *Burdine* framework,[3] the plaintiff first must raise an inference of race discrimination by establishing a prima facie case. *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994) (citation omitted). The purpose of the prima facie case is to show an adverse employment decision that resulted from a discriminatory motive. *See Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1143 (11th Cir.1983). Here, the individual plaintiffs have alleged discrimination in various facets of their employment at Wal–Mart, including promotions, terminations and work environments. Because the elements of the prima facie case vary depending upon the challenged employment decision, the court will discuss the prima facie standards separately when addressing the claims of each individual plaintiff.

■ If a plaintiff succeeds in showing a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant's burden is "exceedingly light," *Perryman*, 698 F.2d at 1142, as it "must merely proffer [race neutral] reasons, not prove them." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citation omitted) (brackets supplied). Once the defendant satisfies its burden of production, the *McDonnell Douglas* framework, with its presumptions and burdens, drops out of the case, and the only inquiry becomes "whether [the] plaintiff has proven 'that the employer intentionally discriminated against' him because of his [race]." *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749. To prove discrimination after the *McDonnell Douglas* framework drops out, a plaintiff can show (by either presentation of evidence or cross-examination of defendant's witnesses) that the defendant's proffered reason was a pretext for discrimination, "[b]ut a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." [4] *Id.* at 515, 113 S.Ct. at 2752.

■ Moreover, race must be "a determinative factor in the employer's decision, though it need not have been the sole factor." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525,

3. The Supreme Court of the United States adopted this analysis to implement "[t]he language of Title VII," which "makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas*, 411 U.S. at 800, 93 S.Ct. at 1823.

4. *St. Mary's* clarified the Supreme Court's prior holding in *McDonnell Douglas* regarding the proof required to prevail in a Title VII case where a plaintiff presents circumstantial evidence of discrimination. Lower courts interpreting *McDonnell Douglas*, including the Court of Appeals for the Eleventh Circuit, had found that a plaintiff could satisfy his or her Title VII burden of proof "indirectly by showing that the employer's proffered explanation [was] unworthy of belief." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir.1992) (holding that the plaintiff satisfied his burden by showing that the employer's reasons were unworthy of credence); *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1554 (11th Cir.1990) (same). In other words, "the falsity of the employer's explanation [was] *alone enough* to compel judgment for the plaintiff." *St. Mary's*, 509 U.S. at 517, 113 S.Ct. at 2752 (emphasis supplied). *St Mary's*, however, made it clear that a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason" ... and "it is not enough ... to disbelieve the employer...." *Id.* at 511 n. 4, 113 S.Ct. at 2749 n. 4 (emphasis supplied).

1528 (11th Cir.1987); *see also Monroe v. United Air Lines, Inc.*, 736 F.2d 394, 402 (7th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1356, 1357, 84 L.Ed.2d 378 (1985) (circuit approval for "a determining factor" jury instruction); *Cuddy v. Carmen*, 694 F.2d 853, 857–58 (D.C.Cir.1982), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985) (The plaintiff must "show by a preponderance of the evidence that age was 'a determining factor' in the employer's decision" or that age "made a difference.").

In this case, Wal–Mart has submitted voluminous briefs detailing the reasons that the plaintiffs' claims must fail. The briefs include extensive citations to the deposition testimony of the plaintiffs and also include various affidavits from Wal–Mart's supervisors. In response, the plaintiffs submitted a single, twelve-page brief. The brief is in narrative form only and includes no citations to the record or evidence, as required by Rule 56 of the *Federal Rules of Civil Procedure* and the court's Rule 16 Scheduling Order entered in this case on September 16, 1994. The plaintiffs merely state that the "[t]he evidence of record, including, but not limited to, the sworn averments submitted to the EEOC by affidavit establishes a prima facie case of discrimination." Pls' Br. in Opp. to Summ. J., filed March 27, 1995, at 11.

Finding the plaintiffs' submission completely inadequate to defeat Wal–Mart's motions for summary judgment, the court, *sua sponte*, allowed the plaintiffs to submit additional evidence to rebut Wal–Mart's motions. The court has, thus, generously allowed the plaintiffs "two bites at the apple." The plaintiffs now have supplemented the record with declarations from each plaintiff. As discussed *infra*, seven of the twelve plaintiffs still have failed to raise a genuine issue of material fact as to their claims, primarily because their declarations are, for the most part, wholly conclusory. *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir.1984) ("[M]ere verification of a party's own conclusory allegations is not sufficient to oppose a motion for summary judgment."); *see also*

*Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1084 (11th Cir.1990). Hence, the court has no option but to grant Wal–Mart's motions for summary judgment as to seven of the plaintiffs.

## II. Findings of Fact and Conclusions of Law

### A. Kumasi Mants

Plaintiff Kumasi Mants ("Mants"), a black male, worked at Wal–Mart from November 1990 to June 1993. For the majority of his employment, Mants was an hourly sales associate in the Pet Department. Mants asserts that Wal–Mart discriminated against him because of his race in violation of Title VII. The alleged racially discriminatory acts include wrongful discharge, denial of promotion and hostile work environment. The court will address each in turn.

#### 1. Wrongful discharge

##### (a) Findings of Fact

On June 1, 1993, Wal–Mart fired Mants because, according to Wal–Mart, Mants violated a company policy that prohibited employees from conducting personal business while working on the premises. This policy provides that "[W]al–Mart will provide the supplies and materials necessary for you to perform your job. All company supplies, property and facilities are to be used for company business only and should not be used by you for any type of personal gain." Barnes' Decl. at ¶ 4 (Ex. C).

Wal–Mart asserts that in October 1992, Mants received a "decision-making day" write-up for offering to set up a Wal–Mart aquarium for a customer in exchange for a donation.[5] According to Wal–Mart, in May 1993 and again in June 1993, Mants assisted a customer named Fred Weafer ("Weafer"), who worked at Sam's Wholesale Club, a subsidiary of Wal–Mart. Weafer reported to Wal–Mart management that on these two occasions, Mants told him that he had a business "on the side" and could sell him an

---

5. A "decision-making day" is basically the third step in Wal–Mart's disciplinary coaching system and is the last step before termination.

aquarium that was in the trunk of his car. Weafer's Decl. at ¶ 1.

Mants refers only to the June 1993 discussion with Weafer. Specifically, Mants states that Weafer approached him about purchasing a Wal–Mart aquarium and asked Mants if he would help him set it up at home. Mants admits that he "suggested [he] would be willing to set up an aquarium in Weafer's home during ... off hours" and that he gave Weafer a calling card with his name, address and telephone number. Mants' Decl. at ¶ 3. While Mants "admit[s] that [he] intended to charge the 'customer' a fee to be agreed upon later," Mants denies that he violated company policy. *Id.* at ¶ 2. Namely, Mants asserts that "[b]ecause the transaction would have occurred during [his] off hours, it would not have violated company policy." Mants also asserts that he did not think his offer violated company policy because he "believe[d] [he] was about to close a sale for Wal–Mart involving more than one hundred and fifty dollars." *Id.* at ¶ 3.

Mants states that "immediately" after Weafer left the Pet Department, Mants was "paged and told to report to the store office." Wal–Mart's Store Manager Gary Barnes ("Barnes") then discharged him stating that a "concerned 'customer' had reported a violation of company policy." *Id.*

Mants further asserts that Wal–Mart management allowed a white employee, Tommy Bishop ("Bishop"), who worked in the furniture department, to assemble in-store furniture for customers for a fee. *Id.* at ¶ 4. In response, Wal–Mart contends Mants' conduct was dissimilar to that of Bishop. Specifically, Wal–Mart admits that it knew Bishop performed these services, but denies that Bishop charged any type of fee.

(b) Conclusions of Law

■ For Mants to establish a prima facie case of race discrimination, where Wal–Mart fired him for the stated reason that he violated a company policy, he must show that: (1) he belongs to a protected class; (2) that he was qualified for the position he held; (3) that he was terminated; and (4) that Wal–Mart awarded the position to someone outside the protected class.[6] *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994) (Title VII violation-of-work rule case where the plaintiff was fired for his alleged misconduct); *Green v. School Bd. of Hillsborough County,* 25 F.3d 974, 978 (11th Cir.1994). *See also Cabiness v. YKK (USA), Inc.,* 859 F.Supp. 582 (M.D.Ga.1994). Mants also may establish the fourth element of the prima facie case by showing that the position remained open. *Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073 (11th Cir.1995).

Mants is a black male, and it is undisputed that on June 1, 1993, Wal–Mart terminated him. Additionally, Wal–Mart has not disputed that Mants was qualified for the position he held. Hence, the court finds that Mants has satisfied the first three elements of the prima facie case.

The court finds, however, that Mants has failed to raise a disputed issue of material

6. Mants argues that he did not violate company policy. In the alternative, he argues that Wal–Mart did not enforce its policy against Bishop, a similarly-situated white employee. In *Jones v. Gerwens,* 874 F.2d 1534 (11th Cir.1989), the Eleventh Circuit held that

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540 (citation omitted).

The Eleventh Circuit held that the prima facie case set forth in *Jones* applies in discriminatory discharge cases where the employee alleges disparate discipline for violations of work rules but is not actually terminated. *Id.; see also Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 n. 4 (11th Cir.1994) (stating that "[t]he holding in *Jones* ... applies only to Title VII cases in which a plaintiff has not been terminated and therefore cannot show that he or she was replaced by a person outside of the protected class").

Here, it is undisputed that Mants was terminated, thus, rendering the *Jones* prima facie standard inapplicable. Mants' evidence, however, would be relevant in raising a genuine issue of disputed fact as to pretext. As discussed, *infra,* however, the court never reaches the pretext issue, because Mants has failed to overcome his initial burden of establishing a prima facie case.

fact as to the fourth element. The Eleventh Circuit recently has emphasized that a plaintiff cannot make out a prima facie case if he or she does not establish that the position was *in fact* "awarded to a person of a non-protected class." *Green,* 25 F.3d at 978. In *Green,* the plaintiff was employed as a substitute food service worker and sought a permanent full-time position. The plaintiff's employer denied her the position and instead hired another substitute worker. Thereafter, the plaintiff filed a charge of national origin discrimination with the EEOC, claiming that her employer discriminated against her because she was of East Indian descent. The EEOC denied the charge, and the plaintiff commenced a Title VII lawsuit. Because the evidence at trial did not reveal the successful applicant's national origin, the Eleventh Circuit held that the trial court erred in finding that the plaintiff had established a prima facie case of discrimination.

 Here, as in *Green,* the record is devoid of any evidence regarding Mants' replacement. Mants never mentions in either his deposition or declaration whether an employee outside the protected class replaced him or whether the position remained vacant after his termination. Mants, who bears the initial burden of raising an inference of race discrimination, has not even addressed the fourth element of his prima facie case. As such, the court finds that Mants cannot prevail on his termination claim.[7]

 Even assuming, *arguendo,* that Mants had satisfied his prima facie case, the court finds that Wal–Mart successfully has

rebutted any inference of discrimination by asserting that it fired Mants for violating a company policy. In discharge cases, violations of work rules have been held to constitute legitimate reasons for termination. *Jones,* 874 F.2d at 1540; *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984).

 Mants, on the other hand, denies that his conduct breached company policy. The court, however, need not involve itself in an interpretation of Wal–Mart's company policy to determine whether Mants' actions constitute a breach thereof. That is because, even assuming that Mants did not violate company policy, an employer's good faith belief that an employee violated a work rule sufficiently rebuts an inference of discrimination. *Jones,* 874 F.2d at 1540. Here, Barnes asserts that his decision to fire Mants was based on a report from Weafer that Mants tried to sell him a non-Wal–Mart aquarium. The court finds that this, in conjunction with Mants' previous write-up concerning similar conduct, is sufficient factual evidence to support Wal–Mart's assertion that it had a good faith belief for firing Mants.

Because Mants cannot overcome his initial hurdle of establishing a prima facie case, the court need not examine Mants' argument that he was discharged for engaging in conduct comparable to that of a white employee, who was allowed to remain on the job.[8] Accordingly, the court finds that summary judgment is due to be granted as to Mants' wrongful discharge claim.

7. In so finding, the court recognizes that there are some circumstances where a plaintiff can establish a prima facie case even where, for example, the "employer hired a minority to fill the vacancy left by the plaintiff." *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir.1995) (citing *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1534–35 (11th Cir. 1984)). In the latter situation, the court in *Edwards* stated that the relevant inquiry includes whether the hiring of the protected group member occurred prior to or after the filing of the EEO complaint, the time duration between the plaintiff's rejection and the employer's hiring decision and "if the hired person had a history with the employer, whether it was a positive history." *Id.* at 1521 (citations omitted). Obviously, these factors will not save Mants' prima facie case

because Mants has failed to present any evidence or argument as to the fourth element.

8. The parties dispute whether Bishop received a fee for assembling in-store furniture for customers. Wal–Mart asserts that Mants' conclusory assertion that he has "personal knowledge" that Bishop charged customers is inadmissible as evidence. Specifically, Wal–Mart asserts that Mants "does not indicate how he knows what Bishop was doing—whether he personally witnessed it or whether Bishop or someone else told him about it...." Def.'s Reply to Pl.s' Resp. to Wal–Mart's Mot. for Summ.J. at 8. Since Mants cannot establish a prima facie case of discrimination, the court finds it unnecessary to determine the admissibility of Mants' statements.

### 2. Denial of Promotion

#### (a) Findings of Fact

On or about February 26, 1993, a Department Manager position in the Pet Department became open. It is undisputed that the position was filled by Bishop, a white employee who worked in the Furniture Department. Assistant Manager Willie Morgan ("Morgan"), a black male, decided to offer the position to Bishop, and his decision was approved by the Store Manager. Morgan asserts that he chose Bishop over Mants because Bishop was more reliable and dependable and had experience performing managerial duties in the Furniture Department. On the other hand, the evidence shows that Mants obtained average performance ratings that included negative comments as to his absenteeism and dependability. For example, Mants received several disciplinary write-ups for misconduct, such as working on his car while "on the clock" and offering to set up a Wal–Mart aquarium in exchange for a donation.

Mants, on the other hand, asserts that he had more experience than Bishop. He states that he often worked as the "Acting Manager" of the pet department and, thus, "had performed the duties of manager," which included "ordering merchandise, keeping shelves stocked, pricing merchandise and supervising and training other employees." Mants' Decl. at ¶ 8.

#### (b) Conclusions of Law

 To make out a prima facie case in a failure-to-promote case, Mants must show: (1) that he belongs to a protected class; (2) that he applied for and was qualified for the position for which Wal–Mart was seeking applicants; (3) that he was denied the promotion; and (4) that an another equally or less qualified individual outside the protected class received the promotion. *Batey*, 24 F.3d at 1334 n. 11 (*citing Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989)).

Wal–Mart assumes "for the purposes of [the summary judgment] motion only" that Mants has satisfied his prima facie case. Hence, the court will proceed to second part of the burden-shifting analysis. The court finds that Mants has failed to offer proof that Wal–Mart's legitimate, nondiscriminatory reason for promoting Bishop—Bishop's alleged superior qualifications—is a pretext for discrimination. Wal–Mart has explained in depth that Mants was not chosen for the Department Manager position because of his performance problems, which in Wal–Mart's opinion rendered him less qualified than Bishop. Mants has not disputed Wal–Mart's assessment of his performance and has presented no evidence to assail Bishop's qualifications.

Mants merely asserts that Bishop was unfamiliar with the Pet Department and that he had to train Bishop. The court finds, however, that there is no indication that such assistance is unusual for an employee transferred to a different area of the store. In *Durham, supra* at 784, the Tenth Circuit affirmed summary judgment for the defendant, where the plaintiff alleged discrimination when she was denied a promotion to a controller job. The Tenth Circuit explained that

> [a]lmost all of [the plaintiff's] evidence would only support a finding that she was qualified for the controller job, not that she was more qualified than those promoted. She does assert that she had more experience than those who got the job, but her own description of her experience supports Xerox's claim that her experience was only gathering financial data, not financial planning. Furthermore, she has produced no evidence of the successful candidates' experience to compare to her own. Mere seniority does not support a finding that she was more qualified for a different job. Her only other comparative evidence is her testimony that she trained the controllers. But this only shows that Durham had experience with some specific tasks that the controller would have to perform, not that she generally had better evaluations, financial planning experience, interpersonal skills, management experience, conceptual skills, or organizational skills.

18 F.3d at 840 (internal citations omitted).

 For the same reasons asserted in *Durham*, the court finds that Mants' bare allegation that he was familiar with the man-

agerial duties of the pet department does not create a jury issue as to pretext. Mants has not raised a factual issue that he had been performing such duties successfully and also does not dispute his documented performance problems. Wal–Mart does not violate Title VII by choosing a more qualified, or even an equally qualified, white candidate over a qualified black candidate unless it did so with discriminatory intent. *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–97. Mants has not proffered one piece of evidence to support a finding that the real reason Wal–Mart did not choose him was because of his race.

At most, Mants has argued that Wal–Mart's asserted reason for denying him the promotion was false. However, the mere implausibility of the asserted reason is insufficient, standing alone, to create a jury issue. *St. Mary's,* 509 U.S. at 511 n. 4, 113 S.Ct. at 2749 n. 4. Mants has stated in a conclusory manner that he is more qualified for the position. The law is clear that a litigant's self-serving assertion does not create a genuine issue of fact. *Pitts v. Shell Oil Co.,* 463 F.2d 331, 335 (5th Cir.1972).

Moreover, the Eleventh Circuit has held that it is the perception of the decision-maker that is relevant. Wal–Mart has shown in detail that Bishop possessed skills above and beyond those held by Mants. Even assuming that Mants was the best qualified person for the position, however, "Title VII does not require an employer ... to promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color or national origin." *McCarthney v. Griffin–Spalding County Bd. of Educ.,* 791 F.2d 1549, 1552 (11th Cir.1986) (citations omitted); *see also Smith v. Horner,* 839 F.2d 1530, 1538 (11th Cir.1988) (*quoting Clark v. Huntsville City Bd. of Educ.,* 717 F.2d 525, 527 (11th Cir.1983) (holding that where " 'an employer selects the person it believes is best qualified, an argument of pretext ordinarily will fail' "). Here, Mants has not submitted any evidence demonstrating that Wal–Mart's decision not to promote him was based on race considerations.

Additionally, the promotion decision was primarily made by a black assistant manager, Morgan, which while not dispositive, indicates an absence of discrimination. *Moulds v. Wal–Mart Stores, Inc.,* 935 F.2d 252, 256 (11th Cir.1991) (denial of promotion not discriminatory where a black manager was involved in the decision-making process); *Young v. Lehman,* 748 F.2d 194, 197 (4th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985) (no race discrimination in promotions where minorities were on selection panel).

Finally, there was a racially balanced mix of Department Managers in the store where Mants worked. In fact, in May 1993, there were fourteen black and eight white Department Managers. Barnes' Decl. at ¶ 6. The fact that many other black employees occupied Department Manager positions certainly weakens Mants' claim that race was the real reason he was not promoted. *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 911 (4th Cir.1989) (no discrimination in promotions since other blacks had been promoted); *Burrows v. Chemed Corp.,* 743 F.2d 612, 617 (8th Cir. 1984) (no sex discrimination in promotions where other women were promoted).

While summary judgment is often not appropriate where intent is at issue, "[u]nsupported allegations as to motive do not confer talismanic immunity from Rule 56" of the *Federal Rules of Civil Procedure. Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). Without any proof of pretext, Mants cannot meet his ultimate burden of proving intentional discrimination. Accordingly, the court finds that summary judgment is due to be granted in favor of Wal–Mart as to Mants' denial of promotion claim.

### 3. Hostile Work Environment
#### (a) Findings of Fact

Mants asserts that Wal–Mart engaged in various acts of racial harassment during his three-year employment. First, Mants asserts that he was asked "on a regular basis" to gather shopping carts from the parking lot, while white employees holding similar

positions were not asked to do so. Mants' Decl. at ¶ 6. Mants states that not only was gathering shopping carts not in his job description but also that "the [P]et [D]epartment was not located near the exits, so management had to go out of its way to page [him] to leave [his] department and bring in the carts." *Id.* Further, Mants states that "I was asked to gather shopping carts time and again when white employees were less busy and nearer the exits." *Id.*

Second, Mants asserts that a co-manager, Artie Moore ("Moore"), once "questioned [him] with suspicion when [he] helped a black male customer load his purchases into an automobile." *Id.* at ¶ 7. Moreover, Mants asserts that Moore "subtly but consistently, treated [him] as if suspected of dishonesty, in a manner different from the way he treated white employees." *Id.*

(b) Conclusions of Law

■■■ To set forth a prima facie case of hostile work environment based upon race, Mants must establish that: (1) he belongs to a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition or privilege of employment; and (5) respondeat superior. *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982).

■■■ To satisfy the fourth element of the prima facie case, a plaintiff must show that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). In determining this question, courts must look to the totality of circumstances. *Id.* at 22, 114 S.Ct. at 371. While a " 'mere utterance of an ... epithet which engenders offensive feelings in a employee,' does not sufficiently affect the conditions of employment to implicate Title VII," the environment does not have to be so severe as to cause a "nervous breakdown" or "seriously affect employees' psychological well-being." *Id.* at 21–22, 114 S.Ct. at 370–71 (citations omitted).

■■■ The court finds that Mants has failed to show that the alleged acts attributable to Wal–Mart's supervisors were so severe and pervasive to constitute a racially hostile work environment in violation of Title VII. Mants alleges only two incidents that allegedly occurred over a period of three years, and the racial motive behind the incidents claimed is dubious at best. At his deposition, Mants testified as follows: "Q. Was there anything racial about being sent to get shopping cart? A. No, I don't think so." Mants' Dep. at 37–38. Mants also cannot identify any white employees who were not asked to gather shopping carts. *Id.* at 48. Without any comparative evidence of similarly-situated white employees, the court has nothing from which it can infer that being made to collect shopping carts was race motivated. While gathering shopping carts may have been inconvenient, Title VII does not create a cause of action for unpleasant working conditions caused by something other than a protected status. *Robertson v. Alabama Dept. of Economic and Community Affairs,* 902 F.Supp. 1473, 1480 (M.D.Ala. 1995) (DeMent, J.). In short, the court finds that Mants has failed to show that the conduct of which he complains was related to his status as a black person.

As to the remaining statement that a co-manager questioned him with suspicion, courts have held that isolated and sporadic incidents of harassment are insufficient to create a hostile working environment. *Rogers v. Equal Employment Opportunity Comm'n,* 454 F.2d 234, 237–238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *see Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981) (explaining that there must be a "steady barrage of opprobrious racial comment"); *see Clayton v. White Hall School Dist.,* 875 F.2d 676, 680 (8th Cir.1989) (affirming summary judgment for the defendant because the plaintiff's "single incident of alleged [race] discrimination" was insufficient to establish a claim for hostile work environment). Additionally, as above, Mants has failed to present any comparative evidence. Accordingly, the court finds that summary judgment is due to be granted as to Mants'

claim asserting a hostile work environment based on race.

### B. Calandra Cherry

#### 1. Findings of Fact

Calandra Cherry ("Cherry"), a black female, worked as a part-time employee from May 1991 until September 1993. Her sole claim is that, like Mants, she was discriminated against based on her race when Assistant Manager Willie Morgan ("Morgan") denied her a promotion to be Manager of the Pet Department. As already stated, it is undisputed that Bishop, a white male, was promoted to this position at Morgan's selection.

Cherry brings her failure-to-promote claim under Title VII. Cherry filed a charge of race discrimination with the EEOC on September 14, 1993. After receiving a right-to-sue letter from the EEOC, Cherry filed a federal complaint on May 25, 1993. Cherry testified at her deposition that she was aware no later than "Christmas" 1992 that Bishop had received the promotion over her. In her declaration filed subsequently, Cherry somewhat modifies her testimony and states that "[t]o the best of my recollection and belief, in early 1993 or late 1992, Tommy Bishop, a white male, was selected for promotion to Pet Department Manager." Cherry's Decl. at ¶ 3. Cherry then explained that she cannot remember the exact date because "it was difficult to know if an opening was filled. This is because there was no uniform practice of announcing openings for promotions. Such openings were published through 'the grapevine.'" Id. at ¶ 4.

#### 2. Conclusions of Law

■■■■■ Wal–Mart contends that Cherry's denial of promotion claim is time-barred for failure to file a charge with the EEOC within 180 days of the denial of the promotion to Manager of the Pet Department. Under Title VII, a plaintiff has 180 days from the date of the alleged unlawful practice to file a charge with the EEOC. *Equal Employment Opportunity Comm'n v. Commercial Office Prods. Co.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 1668–69, 100 L.Ed.2d 96 (1988) (*citing* § 706(e), 42 U.S.C. § 2000e–5(e)). The 180–day period "begins to run from the time that the complainant knows or reasonably should know that the challenged act has occurred." *Stafford v. Muscogee County Bd. of Educ.*, 688 F.2d 1383, 1387 (11th Cir.1982) (citing *Allen v. United States Steel Corp.*, 665 F.2d 689, 692 (5th Cir.1982)). In some instances, however, equitable tolling may save a plaintiff's lawsuit even though he or she failed to timely file a charge within the requisite 180 days. *Smith v. McClammy*, 740 F.2d 925, 926 (11th Cir.1984).

Here, it is undisputed that Cherry filed a charge of discrimination with the EEOC on September 14, 1993. Cherry's claim is, therefore, barred if she knew or reasonably should have known of Bishop's promotion prior to March 12, 1993. Wal–Mart asserts that in making this determination, the court should disregard Cherry's declaration because it contradicts her previous, clear deposition testimony. In *Van T. Junkins & Associates v. United States Indus., Inc.*, 736 F.2d 656 (11th Cir.1984), the court held that in opposing a motion for summary judgment, a party cannot create a genuine issue of material fact by submitting "an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* at 657. Hence, a court properly may disregard such an affidavit as unreliable and a "sham." *Id.* at 658.

■■■■ The court finds that it need not determine whether Cherry's subsequent declaration contradicts her deposition testimony. Even accepting as true all the representations made in her declaration, Cherry's inability to pinpoint an exact date is insufficient to sustain her burden of proving that all jurisdictional prerequisites to filing suit have been met. *Welty v. S.F. & G., Inc.*, 605 F.Supp. 1548, 1553 (N.D.Ala.1985) (citing *Jackson v. Seaboard Coast Line Railroad*, 678 F.2d 992, 1010 (11th Cir.1982)). Cherry's declaration is less than clear regarding the date she became aware of Bishop's promotion. Obviously, "late 1992" is outside the 180–day time limit, and the court has no way of knowing whether "early 1993" falls before or after March 12, 1993. Cherry's Decl. at ¶ 4.

Additionally, Cherry has not argued or set forth any extraordinary circumstances that warrant an equitable deviation from the 180–day time limit. Accordingly, Wal–Mart's motion for summary judgment as to Cherry's Title VII cause of action is due to be granted, and the court need not reach the merits of Cherry's claim.

## C. Corey Crawford and Caroline Glover

### 1. Findings of Fact

Corey Crawford ("Crawford"), a black male, and Caroline Glover ("Glover"), a black female, challenge as unlawful their terminations of employment. Wal–Mart denies the existence of any discrimination and contends that Crawford and Glover's jobs were eliminated as part of a reduction-in-force, which had legitimate purposes and was not a pretext for discrimination. Namely, Wal–Mart asserts that in the Spring of 1993, District Manager Don Bost instructed the management team to implement an economic reduction-in-force due to "overstaffing" at Wal–Mart store # 930. Moore's Decl. at ¶ 2.

According to Wal–Mart, the management team collectively decided to fire those employees with the lowest performance and productivity evaluations. The team made its decisions after reviewing all personnel files, including Crawford and Glover's. In addition to Crawford and Glover, two other employees also were fired, one black male and one black female. Wal–Mart's policy provides that such reductions in force might occur from time to time.[9]

Crawford and Glover have submitted documents indicating that Wal–Mart store # 930 discharged twenty-eight employees from December 1, 1992, through May 5, 1993, and that twenty-one of these employees were black. *Id.* at ¶ 5. These documents were obtained through a Freedom of Information Act request to the EEOC on behalf of Glover.

The documents submitted include "Exit Interview" forms and "Hourly Associate Information Sheet[s]." Wal–Mart conducts an "Exit Interview" prior to an employee leaving the employment of Wal–Mart. Employees fill out an "Hourly Associate Information Sheet" upon obtaining employment at Wal–Mart. As stated on this sheet, Wal–Mart's purpose in obtaining the information contained therein is as follows:

> In order to ensure compliance with those laws and regulations requiring us to file annual statistical reports concerning the make-up of our work force, we request your assistance in completing the following form. This information is requested solely for reporting purposes and will not be used in any decision affecting your continued status as an associate of Wal–Mart Stores, Inc.

These documents reveal the following information:[10]

| EMPLOYEE NAME | RACE/SEX | REASON FOR TERMINATION | DATE TERMINATED | REHIRE |
|---|---|---|---|---|
| *Caroline Glover* | *black/female* | *"lack of work"/"reduction of staff"* | *4/14/93* | *yes* |
| Rodney Wilson | black/male | "seasonal," temporary employee | 12/24/92 | no |
| Troy Ziglar | white/male | "lack of work" | 12/24/92 | yes |
| *Corey Crawford* | *black/male* | *"lack of work"/"reduction of staff"* | *4/13/93* | *no* |
| Charlde Banks | black/male | "seasonal," temporary employee | 12/24/92 | no |
| Rebecca Brouillard | white/female | "lack of work" | 12/24/92 | yes |
| Christine Bennett | black/female | "seasonal," temporary employee | 1/1/93 | yes |

9. This policy also stated:
 If you are terminated during a reduction in work force and are rated "satisfactory, eligible for rehire," you must reapply if, and when you want to be considered for re-employment when vacancies occur which the store needs to fill. The company assumes no obligation to contact you for possible rehire. Remember, applications are only good for 60 days and must be kept current for consideration.
 Glover's Dep., Ex. 8 at ¶ 2.

10. The underlined names represent those employees terminated as part of Wal–Mart's reduction-in-workforce.

| EMPLOYEE NAME | RACE/SEX | REASON FOR TERMINATION | DATE TERMINATED | REHIRE |
|---|---|---|---|---|
| Marilyn Blake | black/female | "temporary assignment" | 12/24/92 | no |
| Fredriatta Brown | black/female | "seasonal," temporary employee | 12/24/92 | yes |
| Ms. Calvin | black/female | "seasonal," temporary employee | 12/24/92 | yes |
| Sabrina Cody | white/female | "failed to report to work"/"temporary assignment" | 12/24/92 | no |
| Christopher Gazaway | white/male | "seasonal," temporary employee | 12/24/92 | yes |
| Mattie Gibbs | black/female | "temporary assignment" | 12/30/92 | yes |
| Carol Howard | black/female | "lack of work" | 12/27/92 | yes |
| *Patrick Johnson* | *black/male* | *"lack of work"/"reduction of staff"* | *4/14/93* | *yes* |
| *Deloris Johnson* | *black/female* | *"lack of work"/"reduction of staff"* | *4/21/93* | *yes* |
| Patricia Jordan | white/female | "Inability to perform job"/"involuntary termination during 90 day probation" | 12/15/92 | no |
| Eugene Jones | black/male | involuntary termination for "insubordination" | 12/15/92 | no |
| Michael Lett | black/male | "temporary assignment" | 12/24/92 | yes |
| Pauline Moore | black/female | "lack of work" | 12/24/92 | yes |
| Stephanie McBride | black/female | "temporary assignment" | 12/24/92 | yes |
| Ricky Poe | black/male | involuntary termination for "violation of company policy" | 12/14/92 | no |
| Roderick Parham | black/male | "lack of work" | 12/24/92 | yes |
| Betty Perdue | black/female | "lack of work" | 12/24/92 | yes |
| Pamela Rivers | black/female | "temporary assignment" | 12/24/92 | yes |
| Randy Smith | white/male | "seasonal," temporary employee | 12/24/92 | no |
| Morgan Washington | black/female | "temporary assignment" | 12/24/92 | no |
| Gloria Woods | black/female | "seasonal," "bad attendance" | 12/24/92 | no |

---

### (a) Crawford

Crawford worked at Wal–Mart as a stock person from October 1992 until his termination in April 1993. Crawford was one of several people initially hired as a temporary employee to work during the Holiday season in December. While many of these temporary employees were terminated after the Holiday season, Crawford was retained.

Wal–Mart asserts that Crawford was selected for termination because he had the poorest performance record of all other stock persons. Indeed, the evidence reveals that Crawford received numerous disciplinary write-ups during his seven-month tenure at Wal–Mart. For example, he received a disciplinary write-up in November 1992 for tardiness and in February 1993 for non-compliance with safety rules.

Additionally, Wal–Mart's documentation reveals that he received a "decision-making day" on March 12, 1993, for failing to report to work for two days without calling in to inform management. On the "decision-making day" form, Assistant Manager Randy Maske ("Maske") wrote that "[i]f it happens again[,] it may result in termination." Craw-

ford's Dep., Ex. 12. On this form, Crawford acknowledged his misconduct and stated that "[a]s far as I'm concerned, I hope that this problem I've created for myself is solved. This will not happen again." *Id.* Crawford received another write-up in April 1993 by Store Manager Mark Ferris for purportedly initiating a confrontation with a fellow employee.

On Crawford's performance evaluation in March 1993 (which occurred one month prior to his termination), he received "Below requirements" ratings in four of seven categories. "Below requirements" are given to those employees who are "[n]ot consistent in performance, [and] require[ ] a great deal of supervision." *Id.*, Ex. 11 (attached thereto). In the three remaining categories, Crawford was rated as "meets requirements." *Id.*

Crawford does not dispute that his performance record was worse than that of any other stock person, and he has not identified any employee who should have been terminated instead of him. *Id.* at 27. Nonetheless, Crawford asserts that the real reason

for his termination was race-related. Crawford states that he overheard Moore tell Maske, that "Corey works like a Mandingo." *Id.* at 56. Crawford testified that, at the time, he did not know what "Mandingo" meant but subsequently he "watched a rented video, *Mandingo,* and realized Moore had compared [him] to a black slave." Crawford's Decl. at ¶ 3. Wal–Mart attempts to discredit Crawford's testimony in this regard by emphasizing that Crawford failed to report this comment to management and did not mention it in either his complaint or in the affidavit attached to his EEOC charge.

### (b) Caroline Glover

Glover asserts sex and race discrimination claims under Title VII. Glover first was hired by Wal–Mart on March 23, 1992, as a temporary employee. She was later assigned to the night maintenance crew as a full-time regular employee, where she worked until she was discharged on April 14, 1993. Glover was the only female who worked on the night maintenance crew.

In the Winter of 1993, Glover was hospitalized for two weeks for complications with bronchial asthma. Her treating physician, Dr. David Franco, instructed her not to use certain cleaning chemicals to which she was exposed when cleaning the restrooms at work. He also wrote her a note, dated February 18, 1993, which read: "To Whom It May Concern, Mrs. C. Glover has moderate to severe bronchial asthma. She *does* not need to be working around *aromatic* chemicals—it exacerbates her disease. Thanks." Glover's Dep., Ex. 12.

Glover gave the note to her supervisor, Dennis Roberts ("Roberts"), a white male, who in turn showed the note to Store Manager Mark Ferris ("Ferris"). Glover states

that they made her continue cleaning the bathrooms.[11]

Glover again was hospitalized and, upon returning to work "sometime ... in March of '93", asserts that she brought Roberts a second note from her treating physician. *Id.* Glover states that at this time, Roberts changed her job duties and instructed her to use the "floor buffers and heavy equipment to clean." *Id.* It appears that her new job responsibilities at this time also included emptying trash cans, cleaning the carpets, and sweeping and mopping the floors. Glover's Dep. at 18. About the buffers, Glover states as follows:

> I didn't mind [using the buffers], and the men in maintenance helped to train me to operate the particular cleaning machines. I was doing a good job using the heavy equipment, as good as the male maintenance workers. However, the home office learned that I was using the heavy equipment and instructed Roberts not to make me use the heavy equipment because I was a woman and could hurt myself. He became more angry at me for this and cursed me. He asked me what could I do if I couldn't use the equipment or the chemicals.[12]

Glover's Decl. at ¶ 5. Glover further asserts that Roberts "cursed" at her "plenty of times" at work in front of her co-workers. For example, Roberts told her that she "couldn't do a damn thing." Glover's Dep. at 59. The other "words" she cannot recall. *Id.* Roberts denies that he ever cursed at her.

Glover then asserts that shortly after this incident, Roberts cut her hours from eight hours per night to five hours per night.[13]

11. Initially, Glover stated that when she returned to work, she was reassigned from cleaning the bathrooms to cleaning the break room, which required using buffers. Glover's Dep. at 12–13. Later, she stated that her previous testimony was not "not correct" and that her supervisor, Roberts, made her clean the bathrooms until she became sick again and had to return to the hospital a second time. *Id.* at 48–49.

12. Glover testified at her deposition, which was taken prior to the submission of her declaration, that she could not recall which supervisor made this statement: Glover's Dep. at 59. As discussed, *infra,* the court finds that her subsequent

memory revival is explanatory and not contradicting, and thus, will be considered in ruling on the summary judgment motion.

13. The court has devoted long hours to studying the evidence in this case. The facts disclosed in Glover's deposition testimony and declaration, which differ in some respects, when compared to the evidence submitted by Wal–Mart are particularly confusing. For example, the facts conflict regarding the exact sequence of events leading to Glover's termination and the specific supervisors who made the various employment decisions regarding Glover's job assignments. Wal–Mart's evidence reveals that on March 9, 1993, Store

Glover's Decl. at ¶ 6; Glover's Dep. at 61–62. Wal–Mart asserts that because Glover was unhappy with her reduced work hours, Glover met on March 10, 1993, with both Ferris and the District Manager, Don Bost ("Bost").[14] Glover complained about the reduction in hours, and was told that the jobs she could do did not require a full-time schedule.

Then, on April 14, 1993, Glover was "laid off." Glover's Decl. at ¶ 6. Glover asserts in her deposition that Willie Morgan, who conducted her exit interview, told her the reason she was being terminated was "because [she] was the only female and couldn't perform the jobs that were being done as the males," thus, she "was the first choice to be laid off." Glover's Dep. at 63. Wal–Mart, on the other hand, asserts that it chose her for termination because she had the lowest evaluation of the workers on the maintenance crew, had the lowest productivity, and was considered to be the least willing to work the job duties in the department. Moreover, Glover's "Exit Interview" report reflects that she was involuntarily terminated for "reduction of staff" and her supervisors checked the box indicating that she could apply for rehiring if a job became available in the future.

Glover claims that the real reason she was terminated was because she is female and because she is black. Shortly after she was terminated, she states that a white male (referred to as "Snake" in her deposition) replaced her on the night maintenance crew. Wal–Mart asserts, however, that while it ultimately hired an employee to fill the position held by the Glover, this hiring did not occur for more than one year after Glover's discharge, when the store's performance had improved.

### 2. Conclusions of Law

■ In reduction-in-force cases, a plaintiff establishes a prima facie case by showing: "(1) that he [or she] was in a protected group and was adversely affected by an employment decision; (2) that he [or she] was qualified to assume another position at the time of discharge ...; and (3) evidence by which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Barnes v. Southwest Forest Indus., Inc.,* 814 F.2d 607, 609 (11th Cir.1987) (citing *Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir. Unit B 1981)).[15] The plaintiff may satisfy the third element by introducing "direct, circumstantial, or statistical evidence" indicating that the defendant singled him or her out for discharge based upon unlawful discrimination. *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

#### (a) Corey Crawford

In its brief in support of summary judgment, Wal–Mart "concedes that Crawford satisfied the first element of the prima facie case and ... assume[s] *arguendo,* for the purposes of this motion only, that he can satisfy the second element since the stock person position was not entirely eliminated." Wal–Mart's Br. in Supp.Mot.Summ.J. as to Crawford's claims, filed Feb. 1, 1995, at 9. Wal–Mart, however, contends that Crawford

Manager Mark Ferris and Sandra Johnson, a management trainee, sat down with Glover to set up a new work schedule. At this time, Wal–Mart asserts that her hours were cut back. Glover does not deny that this meeting occurred, but also asserts, as stated above, that Roberts was the one who reduced her hours. Various other meetings between Glover and her supervisors regarding her work schedule and reduction in hours also appear to have occurred in March of 1993.

Neither the time and place that these meetings occurred nor the specific supervisors involved are materially relevant to ruling on Wal–Mart's motions for summary judgment. The court simply notes that it took considerable time to sort through the various evidence. Such confusion

could have been reduced if counsel for the plaintiffs had taken time to write a memorandum brief in opposition to summary judgment.

**14.** Glover does not remember the exact day she met with Bost and Ferris, but Wal–Mart has submitted evidence that the day was March 10, 1993.

**15.** While liability in *Barnes* was predicated under the Age Discrimination in Employment Act, courts apply the same analysis in determining whether a violation under Title VII has occurred. *McKennon v. Nashville Banner Pub. Co.,* —— U.S. ——, ——, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995).

has not submitted evidence to allow a reasonable jury to conclude that Wal–Mart terminated him on the basis of race. The court disagrees.

 Wal–Mart points to Crawford's personnel file, which the court agrees contains multiple indicia of poor performance. However, Crawford has submitted evidence that he overheard his supervisor, Moore, called him a racially derogatory name, a "Mandingo." Contrary to Wal–Mart's assertion, the court finds that the alleged "Mandingo" comment is material to Mants' termination claim. At the very least, this racial epithet raises a genuine issue of material fact as to whether the management team's decision to terminate him was, in part, based on racial reasons, particularly since Moore was involved in the termination decision process.

The court further finds that while Crawford's documented performance problems constitute a legitimate non-discriminatory reason for termination, the racial slur is, alone, sufficient to create an issue of fact as to pretext. *See St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. at 2749. Accordingly, the court finds that Wal–Mart's motion for summary judgment as to Crawford's termination claim is due to be denied.

### (b) Caroline Glover

### (i) sex discrimination

 The court finds that Glover has established a prima facie case of sex discrimination in her termination. Glover, as a female, is within a class protected by Title VII. *See Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1526 (11th Cir.1992) ("Title VII ... forbids discrimination on the basis of gender, race, or national origin in a wide range of employment practices, including hiring, **firing**, training, and promoting.") (emphasis supplied). Glover unquestionably was "adversely affected" when Wal–Mart terminated her employment.

The court further finds that Glover has presented two pieces of evidence that, if believed by the jury, are sufficient to infer sex

discrimination: (1) Glover's testimony that her superiors would not let her use the buffers because she "was a woman and could hurt" herself and (2) Morgan's statement that she was being terminated because she was a female.

 The court next finds that Wal–Mart has rebutted an inference of discrimination by presenting evidence that Wal–Mart selected Glover for termination based upon her poor work performance. Evidence that a defendant fired a plaintiff based upon a "company wide [reduction-in-force] and poor work performance" are legitimate, nondiscriminatory reasons sufficient to rebut a prima facie case of discrimination. *Earley,* 907 F.2d at 1084 n. 5.

 To survive summary judgment, Glover must offer proof that Wal–Mart's stated reason was a cover-up for sex discrimination. Here, the court finds that Glover's evidence in support of her prima facie case is sufficient to raise a genuine issue of material fact as to pretext:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination.

*St. Mary's,* 509 U.S. at 511, 113 S.Ct. at 2749. Even though Glover's personnel file contains several marks of poor performance, the court finds that in the face of the direct evidence offered by Glover, Wal–Mart should not be entitled to prevail on a motion for summary judgment. Specifically, Morgan's comment that Glover was being terminated because she is female, not only refutes Wal–Mart's purported reasons for firing Glover but also, if found credible at trial, constitutes direct evidence of gender animus for Wal–Mart's decision to fire Glover.[16] *See Miles v.*

---

**16.** As argued by Wal–Mart, the court finds inadmissible and has not considered Glover's deposition testimony, wherein she states that a white male named "Snake" was hired to replace her

shortly after her termination. The court finds that this assertion rests solely upon inadmissible hearsay. Glover claims that "someone" told her that a new worker in the maintenance section

*M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985) (holding that a plaintiff may submit evidence of direct discrimination, such as "discriminatory statements," to show pretext).

The court finds this evidence sufficient by itself to raise a genuine of issue of material fact as to pretext. Moreover, Glover's evidence that her superiors contemplated gender considerations in disallowing her to operate the buffers, if believed, further bolsters her claim. Accordingly, the court finds that summary judgment as to Glover's termination claim based upon sex is due to be denied.

### (ii) race discrimination

Wal-Mart asserts that Glover's race discrimination claim is outside the scope of her EEOC charge and, thus, should be dismissed as a matter of law. The scope of a judicial complaint under Title VII is limited to the acts of discrimination contained in the EEOC charge or claims " 'like or related' " to the claims raised in the charge. *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1569 (11th Cir.1987); *See also Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970) (holding that "the allegations in a judicial complaint ... 'may encompass any kind of discrimination like or related to the allegations contained in the charge and growing out of such allegation during the pendency of the case before the [EEOC]' ").

It is undisputed that Glover complained only about sexual discrimination in her EEOC charge. Glover's Dep. at 56–57, Ex. 3. Making a claim based on one type of discrimination in an EEOC charge does not permit a plaintiff to assert a claim about a totally different type of discrimination in a later lawsuit. *See Ang v. Procter & Gamble*, 932 F.2d 540, 545 (6th Cir.1991) (EEOC claim based on national origin; judicial claim based on race barred); *Buffington v. Gener-*

*al Time Corp.*, 677 F.Supp. 1186, 1194 (M.D.Ga.1988) (EEOC claim based on race; judicial claim based on age barred). Because Glover's claim of race discrimination is beyond the scope of the claims made in her EEOC charge, Wal-Mart's motion for summary judgment as to Glover's race discrimination claim is due to be granted.

Alternatively, the court finds that Glover's race discrimination claim fails on the merits. The record is completely lacking of any evidence that race motivated Wal-Mart's decision to terminate Glover. Even assuming that Glover can establish a prima facie case, she has failed to rebut Wal-Mart's legitimate reason for firing her—her poor performance and productivity. Glover has not identified a single employee, black or white, who should have been terminated instead of her. She also has not pointed to any other maintenance worker with a performance record similar to hers, who was retained. Glover's allegations are conclusory only and, thus, "without more, are not sufficient to raise an inference of pretext or intentional discrimination." *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir.1987).

In an attempt to show pretext, Glover has attached significance to the number of black employees terminated between December 1992 and May 1993. Statistical evidence is one type of evidence admissible to prove pretext. *Miles*, 750 F.2d at 870 (11th Cir.1985); *see also McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825–26 (holding that a plaintiff may present statistics to show that a defendant's articulated, nondiscriminatory reason is pretextual). In *Miles*, the Eleventh Circuit held that statistical evidence is useful for demonstrating a "general pattern" of discrimination in the defendant's employment decisions. 750 F.2d at 873. However, "their usefulness in proving pretext 'depend[s] primarily upon their relevance to the

---

had been hired. Glover can neither recall who told her this nor does she know when this person was allegedly hired to fill her position. Glover's Dep. at 28 & 67.

Evidence in opposition to a motion for summary judgment must be admissible in order to be considered. *See* Fed.R.Civ.P. 56 (Affidavits opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."); *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970 (4th Cir. 1990) (holding that evidence that would be inadmissible at trial cannot be considered in ruling on a motion for summary judgment).

specific decision affecting the individual plaintiff, [and not] those that affect plaintiff's protected class in general.' " *Penk v. Oregon State Bd. Of Higher Educ.*, 816 F.2d 458, 462 (9th Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987) (citation omitted). *Miles*, 750 F.2d at 873 (same).

Here, Glover's offer of statistical proof is a general one based solely upon the number of blacks and whites discharged at Wal–Mart during December 1992 and May 1993. It is clear from *Miles* that what is required is a statistical analysis tailored to the individual facts at issue. Glover presents no evidence of the number of employees at store # 930 or how many were black. For instance, if the workforce at Wal–Mart is seventy-five percent black, then discharging twenty-one black employees and seven white employees within a five month period is hardly significant. *See Krieg v. Paul Revere Life Ins. Co.*, 718 F.2d 998, 1002 (11th Cir. 1983) (per curiam), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984) (insignificant that majority of managers terminated were in protected group because majority of managers employed were in protected group). Statistical evidence cannot be considered in a vacuum. Thus, the court finds that the statistics wholly lack any probative value and cannot raise a genuine issue of material fact. Accordingly, summary judgment is due to be granted as to Glover's race claim asserting intentional discrimination in Wal–Mart's decision to fire her.

### D. Charlotte Hardy and Lola Nowden

#### 1. *Finding of Facts*

Charlotte Hardy ("Hardy") and Lola Nowden ("Nowden"), both black females, assert that Wal–Mart discriminated against them by subjecting them to a racially hostile work environment. Both Hardy and Nowden have been employed at Wal–Mart since 1992. They base their claim on a single incident of alleged harassment.

In sum, they assert that at the end of their shift on April 15, 1993, they were walking through the store together and Hardy was carrying a blouse that had been "marked-down" and that she was planning to purchase. According to these two plaintiffs, two assistant managers, Moore and Morgan, proceeded to "watch" them suspiciously—"in the same manner that they watch persons suspected of shoplifting." Nowden's Dep., Ex. 3. Hardy and Nowden deny allegations of shoplifting and assert that the same two assistant managers did not watch or follow a white co-employee, who one day took a shopping cart full of "marked-down" clothes into her office.

#### 2. *Conclusions of Law*

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). This section prohibits an employer from maintaining a racially hostile work environment. The elements necessary to establish a prima facie case of hostile work environment are set forth *supra* at 791.

Even accepting as true all the facts as represented by Hardy and Nowden, the court finds that this single incident, without more, is insufficient to sustain a claim for a hostile work environment based upon race. Specifically, the court finds that these two plaintiffs have failed to show that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370).

It is clearly established that isolated and sporadic incidents are insufficient to create a hostile working environment. *See Rogers*, 454 F.2d at 237–38; *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412–13 (10th Cir.1987). Accordingly, the court finds that summary judgment is due to be granted as to Hardy and Nowden's claim alleging a hostile work environment based on race.

### E. Twalla McCree

#### 1. *Findings of Fact*

Plaintiff Twalla McCree ("McCree"), a black female, began employment at Wal–Mart in June of 1986 and has worked as a

layaway clerk since late 1992.[17] She predicates liability under Title VII and § 1981, asserting that on two occasions Wal–Mart denied her a promotion because she is black. Specifically, McCree states that: (1) Colleen Sedote ("Sedote"), a white female, was promoted to a service desk position in April 1993; and, (2) subsequently, Debbie Martin ("Martin"), a white female, replaced Sedote in August 1993.

Service desk employees generally handle merchandise returns and refunds. According to Wal–Mart, customer service skills are very important in service desk positions because of "the frequent and ... direct contact with customers." Ross Decl. at ¶ 2. Wal–Mart asserts that McCree was not qualified to work at the service desk. McCree had worked at the service desk from 1987–89 but, according to Wal–Mart, was removed from that position because of "an endless number of customer complaints." Id.; Barnes Decl. at ¶ 4.

When McCree worked as a service desk employee, Earlene Ross ("Ross") was her supervisor.[18] Ross states that because of McCree's "attitude toward customers [and] fellow associates," she has not recommended her for any customer service position. Ross Decl. at ¶ 7. Ross, on the other hand, was "not aware" of any customer complaints against Sedote. Id. at ¶¶ 5–6. As to Martin, Ross states that "[s]he was extremely dependable and flexible, whereas McCree said she could only work specified hours on certain days." Id. at ¶ 4. Both Sedote and Martin had both worked at the service desk temporarily to "give breaks" to the regular service desk employees. Id. at ¶ 6.

Additionally, Wal–Mart points to two "verbal discussion write-ups" issued against McCree. On July 14, 1992, McCree received a written reprimand for missing too much scheduled work time. McCree's Dep., Ex. 5. Then on May 21, 1992, McCree received another "verbal discussion" for taking an ex-

tended lunch break and for raising her voice at the Head Customer Service Manager.

Wal–Mart also states that in a 1992 annual evaluation, McCree received sub-standard ratings as front-end cashier. Out of twenty-five categories, McCree received a "one" (on a scale of five) in a single category and a "two" in four categories. McCree's Dep. at 96–99, Ex. 4 (attached thereto). As printed on the evaluation sheet, a "two" is labeled "below requirements" and means that the associate is "[n]ot consistent in performance [and] requires a great deal of supervision." Id. Two of the below requirements ratings were in the customer service category and the other was in attendance. McCree's overall performance rating was a "3.00," which is "meets requirements" and means that the associate is "consistent in performance, completes all assigned tasks, area runs smoothly and in order." Id.

Finally, it is undisputed that McCree told Store Manager Gary Barnes ("Barnes") that she wanted to be considered for any openings for a service desk position. Barnes and Ross made the decision not to place McCree in a service desk position.

### 2. Conclusions of Law

As previously stated herein, a plaintiff must show the following elements in order to make out a prima facie case of discrimination in a failure-to-promote case: (1) that he or she belongs to a protected class; (2) that he or she applied for and was qualified for the position for which Wal–Mart was seeking applicants; (3) that he or she was denied the promotion; and (4) that an another equally or less qualified individual outside the protected class received the promotion. Batey, 24 F.3d at 1334 n. 11 (citing Wu, 847 F.2d at 1483).

The court finds that McCree has met the first three elements of her prima facie case for each of her denial of promotion claims. That is, McCree, who is black, is a member of a protected class. Second, it is

---

**17.** During her tenure at Wal–Mart, McCree has worked as a service desk associate, a Department Manager in the Jewelry Department, and a sales associate in the Sporting Goods Department. McCree's Dep. at 12–14.

**18.** Ross is a black female.

undisputed that Barnes and Ross knew that she wanted to be considered for a service desk position but refused to give her this job on two occasions. As to the fourth element, Wal–Mart promoted white employees to each of the two positions at issue.[19]

■ The court finds that Wal–Mart has met its burden of showing a legitimate non-discriminatory business reason for denying McCree a position at the service desk. That is, Wal–Mart contends that McCree was not offered this position because of unsatisfactory job performance. Wal–Mart's evidence reveals that there were written work evaluations and objective guidelines for evaluating performance and that McCree's job performance often was inadequate. *See Irvin v. Airco Carbide,* 837 F.2d 724, 725–26 (6th Cir.1987) (performance problems, including those which caused customer complaints, were nondiscriminatory reasons).

■ The court further finds that McCree has not raised a genuine issue of material fact showing that Wal–Mart's proffered reason is pretextual. Despite having ample opportunity from the court to supplement her evidence in opposition to summary judgment, McCree still has failed to provide anything more than conclusory allegations. McCree merely asserts that "[t]he only reason I was not given a chance to serve in these positions is because I am black. The white employees who filled these positions are [not] as qualified as I for the positions." McCree's Decl. at ¶ 1.

McCree has not set forth any facts to support her allegations and, thus, cannot create a genuine issue of material fact. *See Carter v. City of Miami,* 870 F.2d 578, 585 (11th Cir.1989); *Grigsby,* 821 F.2d at 597. McCree must show concrete evidence in the form of facts to show that Wal–Mart's proffered reason is a mere pretext. While McCree asserts that she is more qualified than the white employees who were promoted over her, McCree admitted in her deposition that she does not know the qualifications of either Martin or Sedote. For example, she testified that she does not know if Martin received any write-ups prior to becoming a service desk associate nor does she have any knowledge of her performance evaluations. McCree's Dep. at 100–102, 107.

McCree also asserts that she had more seniority than the ones promoted over her. There is, however, no evidence revealing that Wal–Mart's method for selecting employees for promotions was based on seniority. In other words, McCree has failed to show that "seniority" and "best qualified" are synonymous terms for purposes of promoting employees or that, in this case, the failure to promote a senior employee is a racial cover-up.

■ The court does not " 'sit as a super-personnel department' or 'determine whether the employer exercised prudent business judgment.' " *Heerdink v. Amoco Oil Co.,* 919 F.2d 1256, 1260 (7th Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (quoting *LaSalle Nat. Bank v. County of DuPage,* 856 F.2d 925 (7th Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1536, 103 L.Ed.2d 840 (1989)); *see also Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). "It is not appropriate for the courts to fetter management's discretion by substituting their own judgment as to proper hiring practices." *Heerdink v. Amoco Oil Co.,* 919 F.2d 1256, 1260 (7th Cir.1990) (citation omitted).

■ Thus, the court should not, and will not, require Wal–Mart to adopt what it perceives to be the best promotion procedures. Wal–Mart can base its employment decisions on any considerations as long as they are not discriminatory. In other words, an employer may hire, fire or, in this case, choose not to promote an employee for good reason, bad reason, reason based on erroneous facts, or for no reason at all, as long as

---

**19.** Wal–Mart also argues that McCree's promotion claim is "much ado about nothing because a move to a service desk position would have been merely a lateral move—not promotion." In support of its contention, Wal–Mart cites *Hooks v. Diamond Crystal Specialty Foods,* *Inc.,* 997 F.2d 793 (10th Cir.1993). The court need not address this argument, because even assuming that McCree's cause of action relates to promotions, as defined by various courts under Title VII, McCree has failed to sustain her burden of proof.

its· actions are not based on discriminatory purposes. *See Nix*, 738 F.2d at 1187. Accordingly, the court finds that Wal–Mart's motion for summary judgment as to McCree's denial-of-promotion claims is due to be granted.[20]

### F. Melba Easter

#### 1. *Findings of Fact*

Melba Easter ("Easter"), a black female, has been employed with Wal–Mart since June 1988. Easter claims racial discrimination in the denial of a promotion in August 1993 to a position as Pharmacy Technician. Easter began her employment with Wal–Mart as a sales clerk in the Pharmacy Department. Her primary responsibilities as a sales clerk included "running the cash register and helping the [Over-the-Counter] [M]anager ... to put .out stock." Easter's Dep. at 11.

After seven months as a sales clerk, Easter received a promotion to an Over-the-Counter ("OTC") Manager in the Pharmacy Department. She states that as an OTC Manager, she "was responsible for ordering all merchandise, keeping the shelves stocked and running the cash registers." Easter's Decl. at ¶ 2. Easter worked as an OTC Manager for more than four years before she resigned from that position on January 1, 1993.[21] *Id.* at ¶ 3.

Laine Rosenberger ("Rosenberger"), a white female, was the Pharmacy Manager from March 1992 to December 1993. She states that in August 1993, Wal–Mart created one position for a Pharmacy Technician. Rosenberger states that Wal–Mart initially placed Stephanie Rinn ("Rinn") and Easter, who both previously worked as sales clerks, in the position on an alternating basis. According to Rosenberger, Easter and Rinn alternated on a weekly and then daily basis.

Rosenberger further attests that Wal–Mart subsequently decided to use only one person as the Pharmacy Technician because sharing the duties was inefficient and resulted in administrative inconsistencies. Thus, on or about August 23, 1993, Rosenberger states that she chose Rinn, who is white, for the position of Pharmacy Technician and placed Easter back into her position as a sales clerk in the Pharmacy Department.

Easter's version of the events surrounding the denial of the promotion is quite different. She asserts that the Pharmacy Technician position was never posted but that on or about August 1, 1993, Rosenberger simply "told" her and Rinn that they would receive promotions from their sales clerk positions and would share· the position of Pharmacy Technician. Easter's Dep. at 33–34. Contrary to Rosenberger's testimony, Easter states that the promotion never occurred and that she and Rinn never shared the job responsibilities. *Id.* at 29. Rather, Easter asserts that between August 1, 1993, and the day Rinn was promoted on August 23, 1993, Rosenberger would pull Easter away from her job as a sales clerk and ask her to help out with the duties of the Pharmacy Technician. Easter states, however, that no one told her she was a Pharmacy Technician or that she was then sharing the responsibilities with Rinn.

As to Rinn's promotion to Pharmacy Technician, Easter asserts· that this decision was

---

**20.** In her declaration filed November 28, 1995, McCree appears to raise a new claim for harassment by asserting that the District Manager of the Jewelry Department "harassed" her. McCree's Decl. at ¶ 2. She has not pleaded this claim in her complaint nor has she specified how or how often she was harassed. In any event, her harassment claim is time-barred. As reflected in her declaration, she was only in the Jewelry Department (where all the alleged harassment occurred) until 1991. Any date in 1991 would be far beyond Title VII's 180–day statute of limitations because her EEOC charge was filed on September 17, 1993. Therefore, Wal–Mart likewise is entitled to summary judgment on this claim.

**21.** Easter states that she resigned from this position due to the intolerable harassment and criticism she received from Tommy Woods ("Woods"), a white male, who became the Store Manager during her third year as an OTC Manager. For example, Easter states that Woods was never satisfied with the quantity of merchandise she ordered: "When the merchandise came in, Woods would say 'Order heavy next time.' When I followed his instruction, and ordered heavily, Woods stated: 'You ordered too much.'" Easter's Decl. at ¶ 3.

made without asking her if she was interested in the position. Rather, Easter found out about Rinn receiving the position at a pharmacy meeting held on either August 23, 1993, or August 24, 1993. According to Easter, Rosenberger, during Rinn's evaluations, told Rinn that she would be the Pharmacy Technician.

According to Easter, Rinn "was not really qualified by experience or training to be Pharmacy Technician." Easter's Decl. at ¶ 7. Rinn, at that time, possessed a year's experience as a sales clerk. Easter asserts (and Wal–Mart has not contended otherwise) that her training and more than four years of experience in the Pharmacy Department rendered her qualified for the position.

Wal–Mart, on the other hand, asserts that Rinn was chosen over Easter, because Easter did not express as much of a desire to work as the Pharmacy Technician as did Rinn. Namely, Rosenberger states that when Rinn and Easter were alternating the duties of Pharmacy Technician, she "asked Easter on several occasions whether she wanted to work as [P]harmacy [T]echnician or on the sales floor [in the Pharmacy Department] on a particular day and she said that she did not care." Rosenberger's Decl. at ¶ 2. On the other hand, Rosenberger states that whenever Rinn was given the same option, she "indicated her desire" to perform the duties of a Pharmacy Technician. Id. Easter, however, denies that she told Rosenberger that she "didn't care whether [she] worked on the floor or in the pharmacy." Easter's Dep. at 40.

Moreover, when asked whether she ever spoke to Rosenberger about wanting to be Pharmacy Technician, Easter said, "No, I didn't feel like I had to do that," primarily because of her experience in and knowledge of the Pharmacy Department. Id. at 31. Wal–Mart additionally points to the fact that while Rinn had talked to Rosenberger about the Pharmacy Technician position in July 1993, Easter never asked to be considered for the position nor did she discuss the position with Rosenberger prior to August 1993.

Rosenberger further asserts that she selected Rinn over Easter because

Easter was more capable of working on the [sales] floor [as a cashier] in the [P]harmacy [D]epartment ... than Rinn was, so moving Rinn into the [P]harmacy [T]ech[nician] position was best for the department. Rinn had had some problems handling difficult customers [when] working on the sales floor and [Easter] had much more experience dealing with difficult customers. The [P]harmacy [T]ech[nician] had less contact with customers than a sales clerk.

Rosenberger's Decl. at ¶ 4 (brackets supplied).

Rosenberger states that previously when she had worked as a Pharmacy Assistant, she was the one who recommended Easter for the promotion to OTC Manager. This fact, says Rosenberger, further emphasizes that Easter's race "had nothing to do with [her] decision to make Rinn the regular [P]harmacy [T]ech[nician]" instead of Easter. Id. at ¶ 7.

Wal–Mart further asserts that the position of Pharmacy Technician did not involve a promotion, only a change in job descriptions. According to Wal–Mart, the Pharmacy Technician position would not have resulted in an increase in pay or benefits. In support of its argument, Wal–Mart states that Rinn, who like Easter was a sales clerk, did not receive a pay increase or any additional benefits when awarded the Pharmacy Technician position. Moreover, Wal–Mart asserts that Rinn did not have any supervisory authority and did not have any more advancement opportunities than she possessed as a sales clerk.

Easter, on the other hand, asserts that she considered the Pharmacy Technician position a promotion. Easter testified that the work of a sales associate involved physical labor, such as "putting up stock, getting your clothes dirty, breaking nails, zoning, dusting. . . ." Easter's Dep. at 25. According to Easter, the duties of a Pharmacy Technician were not as labor-intensive, and, for this reason, the position was more appealing to Easter.

Easter states that the duties of the Pharmacy Technician included "filling prescriptions by pulling, counting and bottling them,

and assisting the pharmacist in almost any other way except putting the labels on." Easter's Decl. at ¶ 6. She then states that "[c]ertainly a position with this degree of responsibility would be considered a promotion over sales clerk. Whether or not the promotion would have resulted in an immediate pay increase, it certainly would have afforded me considerable training and experience over and above that which I had." *Id.*

Believing that she had been denied the Pharmacy Technician position on the basis of race, Easter filed a charge of discrimination with the EEOC on September 16, 1993. Wal–Mart states that after Easter filed the charge, she refused to fill in as a Pharmacy Technician even though all pharmacy clerks were cross-trained as Pharmacy Technicians and most filled in whenever necessary. Easter, on the other hand, asserts that to avoid legal liability, Wal–Mart attempted to "ease" her into the Pharmacy Technician position after she filed the charge without actually giving her the title of "Pharmacy Technician." *Id.* at ¶ 8. Specifically, Easter states that "I was assigned [P]harmacy [T]echnician's duties, but given no explanation. I question: 'When did I become Pharmacy Technician?' For asking the question, I was written up." *Id.*

### 2. Conclusions of Law

■ The court finds that Easter has established a prima facie case of discrimination in the denial of a promotion, the elements of which are set out *supra* at 789 and 800–801. First, Easter is black and, thus, a member of a protected class. Second, based on the objective qualifications of Easter, the court finds that she was qualified for the job. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir.1990). ("[O]bjective job qualifications should be considered in evaluating the plaintiff's prima facie case; the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason for discharge is pretext."). Easter had more than four years of experience in the Pharmacy Department and had received excellent written evaluations from her supervisors. *See*

*Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990) (holding that the plaintiff's "satisfactory performance of duties over a long period of time leading to a promotion clearly established his qualifications for the job").

■ Wal–Mart argues that Easter did not express an interest in the Pharmacy Technician position, thus, insinuating that Easter has failed to show that she applied for the position. The court disagrees. A plaintiff need not show that he or she submitted a formal application for a position, where the evidence indicates that the employer used informal methods for filling vacancies or where the employer generally sought out employees for a vacant position. *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.*, 685 F.2d 1149, 1154 (9th Cir.1982) (holding that a formal application is unnecessary where "the employer normally initiated the promotion") (citation omitted); *see also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133–34 (11th Cir.1984) (stating that an employer has a duty to consider all those who reasonably might be interested in a promotion, as well as those who heard of the opening and expressed an interest).

Here, the evidence reveals that Wal–Mart did not use a formal application procedure for filling vacant positions. For example, the opening for Pharmacy Technician was never posted nor were written applications required. Rather, Easter has testified that Rosenberger informed her that she would share with Rinn the responsibilities of Pharmacy Technician. This evidence, at the very least, raises a genuine issue of material fact as to whether expressing an interest in the Pharmacy Technician position was necessary. Even if expressing a desire in a position was a prerequisite to receiving it, the fact that Rosenberger told Easter that she would share responsibilities with Rinn as Pharmacy Technician raises the possibility that Rosenberger knew that Easter was interested in this position. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2d Cir.1992) (holding that the fact an employer gave an employee "perfunctory consideration" for a promotion indicated that the employer knew of his interest

in the position). The evidence in this regard is sufficient to raise a jury issue.

Third, even though Easter was qualified for the position as a Pharmacy Technician, she was refused the position. Fourth, Wal–Mart awarded the position to a white employee.

Wal–Mart also argues that Easter cannot show that the Pharmacy Technician position for which she applied was in fact a promotion, since Easter would have received the same salary and benefits. In other words, Wal–Mart contends that Easter has failed to show that she was adversely affected by Wal–Mart's decision. Wal–Mart points to *Hooks v. Diamond Crystal Specialty Foods, Inc.* 997 F.2d 793 (10th Cir.1993). As part of a company-wide reduction-in-work force, the defendant eliminated the plaintiff's position and assigned him another job within the company. *Id.* at 795. Believing that his reassignment resulted in a demotion and was racially motivated, the plaintiff commenced a Title VII action. *Id.* at 796.

The Tenth Circuit granted the defendant's motion for summary judgment as to the demotion claim and held that the plaintiff's reassignment was merely a lateral transfer. The Tenth Circuit held that "a reassignment is not a demotion unless the employee can show that he receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than his previous assignment." *Id.* at 799 (citation omitted). The court sees no reason why these factors should not equally apply in determining the flipside question—that is, whether a denial of an employment position is a promotion.

Here, Easter does not dispute that her pay and benefits would have been the same whether she remained a sales clerk or received a position as Pharmacy Technician. As indicated in *Hooks,* an increase in pay and better benefits are not the only factors for consideration. The job descriptions of a sales clerk and Pharmacy Technician are markedly different. The court finds that a comparison of the job descriptions and responsibilities of the sales clerk job with those of the Pharmacy Technician position should be left to the jury, not the court. That is, the jury should weigh and evaluate

the skills required for each job and should determine whether Wal–Mart's decision to not award the position to Easter constitutes a denial of a promotion.

The court finds that Wal–Mart has asserted two non-discriminatory reasons for not promoting Easter: (1) Rinn purportedly expressed a great interest in obtaining the position of Pharmacy Technician while Easter did not; and (2) Rosenberger felt that based upon the personalities of Easter and Rinn, placing Easter in the sales clerk position was "best" for the overall efficiency of the Pharmacy Department because Rinn had difficulties handling customers.

Hence, Easter now must show that Wal–Mart's reasons are actually a cover-up for race discrimination. Based upon a comparison of Easter's qualifications and Rinn's, Easter suspects that she was not selected to be the Pharmacy Technician because she was black. The court's inquiry at this stage must focus upon whether Wal–Mart has provided a plausible explanation of its decision to promote Rinn over Easter. *Krenik v. County of Le Sueur,* 47 F.3d 953, 960 (8th Cir.1995). That is, Easter's beliefs about her qualifications are irrelevant; rather, she must produce evidence demonstrating that Wal–Mart's asserted reasons are, in actuality, a bad faith pretext to discriminate against her on the basis of her race.

As already stated, Wal–Mart does not dispute that Easter was qualified for the position, nor has Wal–Mart asserted that Rinn was more qualified. Here, the court finds that the clearly superior qualifications of Easter as compared to Rinn raise a disputed issue of fact as to pretext. Easter had more than four years of experience in the Pharmacy Department and understood well the job responsibilities of Pharmacy Technician. Moreover, Easter's past history of work performance with Wal–Mart is exemplary. Rinn, on the other hand, had only one year of experience with Wal–Mart and did not possess a basic knowledge of the workings of the Pharmacy Technician job.

*St. Mary's* makes clear that a plaintiff cannot meet his or her burden of pretext

by simply refuting the defendant's articulated reasons. The court, however, finds that the gross discrepancies in Easter and Rinn's qualifications are sufficient to raise a factual issue as to pretext. Easter's qualifications were not merely similar to those of Rinn; they far exceeded hers. *See Odom v. Frank,* 3 F.3d 839, 845–46 (5th Cir.1993) ("If ... the passed over applicant who is protected against discrimination is clearly better qualified for the position in question, a finding of pretext masking discrimination can be supported by the promotion of the less qualified person.")

Easter's claim differs from Mants and McCree's, *supra,* both of whom simply asserted in a conclusory fashion that they were more qualified but gave no evidence in support thereof. The court finds that Easter should be allowed to present her case to a jury. Based upon Easter's rejection of Wal–Mart's proffered reasons, combined with her superior qualifications and the elements of her prima facie case, the court finds that a trier of fact could possibly infer intentional discrimination. *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. at 2749. In considering the evidence in the light most favorable to Easter, the nonmoving party, the court cannot find as a matter of law that the challenged promotion decision is free of unlawful motivation. Accordingly, Wal–Mart's motion for summary judgment as to Easter's cause of action is due to be denied.

### F. Aurelia Hart

Aurelia Hart ("Hart"), a black female, was employed as an hourly sales associate from April 22, 1991, to August 28, 1993. Hart claims that Wal–Mart has discriminated against her on the basis of race in three ways: (1) by failing to provide her with a work environment free of racial harassment; (2) by forcing her to resign from Wal–Mart because of the racially intolerable work conditions (constructive discharge); and (3) by denying her a promotion.

#### 1. Findings of Fact

Hart, who began working at Wal–Mart in April 1991, alleges that she was constructively discharged on August 28, 1993. Hart told co-manager Artie Moore ("Moore") on August 28, 1993, that she was quitting her job at Wal–Mart, because she had been offered a full-time teaching position with the Montgomery Board of Education. She asserts, however, that the real reason she quit was because of racial harassment, which she says began immediately after she started working at Wal–Mart.

The harassment of which Hart complains was in the form of excessive and unfair criticism. Two of the assistant managers she specifically accuses of racial harassment, Cinnamon Smith ("Smith") and Willie Morgan ("Morgan"), are black. She also alleges that her Department Manager, Pearl Robinson ("Robinson"), who is black, racially harassed her.

Hart asserts that she requested a transfer from the Domestics Department because Smith repeatedly criticized her job performance and would not send her any help in the Domestics Department when it was busy. Hart also asserts that when she was hired, she told Smith that she would have to leave work every day at a specified time because her mother was keeping her children and that Smith approved. Hart claims, however, that when she asked to leave one time, Smith, in front of a group of people, threatened to fire her if she left, which caused Hart to cry. Hart states that she "always talked to [Store Manager Mark Ferris] about the problems that were going on, and he would say he would investigate it, and nothing would be done." Hart's Dep. at 44.

When she went to work for the Housewares Department, Hart asserts that the harassment continued and first started with Moore. According to Hart, he made her work on computers one night and then criticized her that same night because the department was not neat. She further claims that on one occasion Assistant Manager Randy Maske ("Maske") told her that he did not see her in her department and that no one in the store was pleased with her performance.

Hart also claims that after moving to the Housewares Department, Morgan harassed her. On February 15, 1993, Morgan reassigned Hart to a front-end cashier position because of purported deficiencies in her per-

formance. Hart stated that she felt like this was a demotion because Morgan insinuated that her hours would fluctuate and allegedly threatened to fire her if she did not accept the cashier position.

Hart called the home office to complain about the cashier assignment and was returned to her sales associate position in the Housewares Department after being a cashier for two days. After that time she worked as a front-end cashier on a sporadic basis when she was needed, as did other sales associates. Hart admits that she has no evidence indicating that this transfer was racially motivated.

Hart testified that she thought Wal–Mart was setting the stage for her termination by "demoting" her to a cashier position "because it is known that cashiers are often fired by Wal–Mart." Hart's Dep., Ex. 2. Hart further claims that Store Manager Gary Barnes ("Barnes") harassed her by telling her to sweep the floor one day. In her complaint, Hart alleges that Barnes accused her of trying to leave the store during her shift when she was actually going to the service desk, and that he "wrote her up" without checking with other employees to verify her whereabouts. Hart testified that Barnes never talked to her about this incident and that she does not know whether anyone else, in fact, wrote her up. Barnes states that he never had any discussion with Hart about this matter and never took any disciplinary action against her. Barnes also states that he checked the clock-in and clock-out times of numerous employees.

Hart further alleges that on or about July 1, 1993, she was denied a promotion to a "May I Help You" clerk position. A "May I Help You" clerk is not assigned to any particular department and is solely responsible for assisting customers. Four "May I Help You" clerk positions were filled by Barnes in July 1993. Two employees receiving these positions were white and two were black. Barnes asserts that he filled the positions based upon past performance, aggressive customer service, courtesy toward customers and friendliness. Barnes further asserts that if Hart had received the "May I Help You" position, it would have been a lateral move and not a promotion, because Hart would not have received a pay increase or had any supervisory authority. Additionally, Barnes states that "May I Help You" clerks were not entitled to any advancement opportunities to which a sales associate would not have been entitled. Hart, however, considers the move to a "May I Help You" clerk position to be a promotion because she could have gone home when the store closed instead of having to stay late and clean up a department.

### 2. Conclusions of Law

#### (a) Hostile Work Environment

■ The elements for setting out a prima facie case for a hostile work environment claim are set out *supra*, at 791. A plaintiff can support a hostile work environment claim based on race by showing "a working environment dominated by racial slurs." *Johnson*, 646 F.2d at 1257; *Equal Employment Opportunity Comm'n v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 (11th Cir.1990) (holding that racially biased statements made by a supervisor to workers in his plant supported a hostile work environment claim under Title VII).

Here, Hart has not claimed that any of her supervisors ever uttered a racial slur directed toward her or anyone else. The focus of Hart's claim, rather, is that the constant criticism and unfavorable treatment accorded her by her various supervisors were racially discriminatory and so permeated her work environment as to violate Title VII.

■ Absence racial slurs, as here, a plaintiff also may establish a hostile work environment claim by showing that white employees receive more favorable treatment than their black counterparts. For example, in *Johnson v. Lillie Rubin Affiliates, Inc.*, 5 Empl.Prac.Dec. (CCH) P 8542, 1972 WL 252 (M.D.Tenn.1972), the plaintiff argued that during her employment, she and other black employees were not afforded the same treatment as were white employees. Namely, black stock persons were required to address white employees as "Mrs." or "Miss," while the white employees called their black co-workers by first names only. The court

found that this policy was racially discriminatory because it singled out blacks.

The court finds that Hart has failed to present any evidence showing that the intolerable harassment that she allegedly endured had anything to do with her race. Hart has offered no comparative evidence that Wal–Mart singled her out and treated her more harshly than white employees. Here, the incidents alleged by Hart, when considered individually and in their totality—and viewed in the light most favorable to Hart—simply do not paint a picture of a hostile working environment based upon race because there is no evidence that the management treated Hart harshly **because she is black.** *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994) [22] ("If the nature of an employee's environment, however unpleasant, is not due to [race], [he or] she has not been the victim of [race] discrimination as a result of the environment.")

Without any comparative evidence, the incidents alleged by Hart constitute, at most, unfair and unprofessional treatment. Title VII, however, does not protect employees from unpleasant working environments. *Vore v. Indiana Bell Telephone Co.,* 32 F.3d 1161, 1162 (7th Cir.1994) (Title VII "provides that an employee is to be free ... from a racially-hostile work environment," but an employer is not required to guarantee a pleasant workplace). While the evidence may reflect unfavorably on the personality and management capabilities of her supervisors, it is insufficient to show that there was a pervasive hostility toward blacks. Accordingly, the court finds that Wal–Mart's motion for summary judgment as to Hart's hostile work environment claim is due to be granted.

### (b) Constructive Discharge

The court likewise finds that Wal–Mart cannot be held liable under a constructive discharge theory, since the working conditions were not "so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir. 1986). In *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518 (11th Cir.1991), the Eleventh Circuit repeated the familiar standard by which constructive discharge claims are analyzed:

'The law in this circuit with respect to constructive discharge is well-established. To show constructive discharge, the employee must prove that his [or her] working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign.' Before finding a constructive discharge, this court has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'

*Id.* at 1527 (citations omitted). A reasonable employee is one who does not "assume the worst" or "jump to conclusions too fast." *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987).

The court finds that the conduct attributed to Wal–Mart—excessive and unwarranted criticism—is not the type of conduct that would make working conditions so intolerable that a reasonable person would feel compelled to resign.[23] *Boze v. Branstetter,* 912 F.2d 801, 804–06 (5th Cir.1990) (unwarranted criticism, probation, poor performance evaluation and withdrawal of responsibilities not constructive discharge as a matter of law);

---

**22.** While *Stahl* stood for the proposition that a claim based on a sexually hostile work environment requires the underlying conduct to have offended the gender of the claimant, the same reasoning applies in race claims.

**23.** For example, in *Martin v. Citibank, N.A.,* 762 F.2d 212 (2d Cir.1985), the Court of Appeals for the Seventh Circuit considered a Title VII claim based upon a constructive discharge theory. The plaintiff, a black employee of the defendant Bank, alleged that she resigned because of intolerable working conditions. The racially-charged incidents included her supervisor's unnecessary announcement to coworkers that the plaintiff had been polygraphed with respect to missing money at another branch of the bank, unfounded complaints as to the plaintiff's attitude, and other conduct by the supervisor and coworkers that interfered with the plaintiff's ability to perform her duties. The Seventh Circuit affirmed the district court's grant of summary judgment and held that as a matter of law the circumstances "do not legally suffice to sustain an inference that a reasonable person would have been 'compelled' to resign." *Id.* at 221.

*Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360–61 (2d Cir.1993) (undue criticism and a poor performance evaluation not sufficient for constructive discharge); *Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156–58 (2d Cir.1993) (pervasive criticism accompanied by yelling and pounding on table not constructive discharge). Accordingly, the court finds that Wal–Mart's motion for summary judgment as to Hart's constructive discharge claim is due to be granted.

### (c) Denial of Promotion

 Hart's promotion claim also is legally insufficient to survive a motion for summary judgment. She merely attaches her EEOC affidavit, which consists of an allegation that the position she desired was given to a white female and that she was the best qualified applicant. Hart does not show that the position was a promotional opportunity, that she was qualified for such position or that racial animus had anything to do with the denial of the alleged promotion. Hence, she has not presented a prima facie case. A mere allegation that a plaintiff is more qualified than those receiving the alleged promotions is conclusory only and not evidence. *See Carter*, 870 F.2d at 585 (conclusory allegations are insufficient to create a dispute as to a material issue of fact); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 (5th Cir. 1993) (summary judgment for employer where plaintiff's evidence of his qualifications was a self-serving, conclusory affidavit stating that he was " 'much better qualified' " than his comparator).

 Additionally, Hart has not even attempted to demonstrate that Wal–Mart's proffered reason for promoting others was pretextual in any way. There is simply no analysis of the appropriate comparators. In fact, Hart testified that if half of the promotions were awarded to black employees and half to white employees, then the selection process would not have been racially discriminatory. Hart's Dep. at 92; *See also Evans v. Bally's Health & Tennis, Inc.*, 64 Fair Empl Prac.Cas. 33, 1994 WL 121479 (BNA) (D.Md.1994) (Plaintiff could not withstand summary judgment where two of the four positions sought were filled by black employees.). Because the undisputed evidence is that half of the "May I Help You" positions were given to black employees, the court finds that Hart has failed to show that race was involved in denying her a promotion. Accordingly, Wal–Mart's motion for summary judgment as to the denial of promotion claim is due to be granted.

### G. Terri Howard–Stallworth

#### 1. Findings of Fact

Terri Howard–Stallworth ("Stallworth"), a black female, was employed at Wal–Mart from April 4, 1990, to June 29, 1993. Stallworth alleges race discrimination in violation of Title VII and § 1981 in the denial of a promotion to the Department Manager position in the Domestics Department. Stallworth also asserts a constructive discharge claim.

Stallworth's first position at Wal–Mart was in the Domestics Department where she worked as a full-time sales associate. She remained in this position for one-and-a-half years. Because of disagreements with her Department Manager over her schedule, she requested to move to a cashier position. Around June 1992, Stallworth was assigned to the Men and Boys Department as a sales associate. She remained in this position until she resigned on June 29, 1993.

In her complaint, Stallworth alleges that Wal–Mart transferred her to the Men and Boys Department "for the purpose of harassing [her] and to pressure her to resign." Stallworth's Compl. at ¶ 12. She avers that a position in the Men and Boys Department was less desirable because while she worked there, she received constant criticism from Department Manager Pearl Robinson ("Robinson"), a black female. Stallworth, however, testified that she had no facts to support her allegation that Wal–Mart transferred her for purposes of harassment and to pressure her to resign. She further admitted that transfers from one department to another were routine at Wal–Mart. Stallworth also alleges in her complaint that Wal–Mart created a hostile work environment based upon race. In her deposition, Stallworth identified one incident of alleged race discrimination—the denial of a promotion to the position of De-

partment Manager in the Domestics Department.

Stallworth testified that she resigned because of problems she had with Robinson, because she was overworked, and because she felt like she was not appreciated. Robinson, allegedly "bad-mouthed" Stallworth to other Department Managers, sometimes in Stallworth's presence. In fact, Stallworth walked off the job on June 29, 1993, because of a heated conversation she had with Robinson that day concerning whether Stallworth had to work on July 4.

Stallworth complains that she was overworked in the Men and Boys Department. For example, she states that she had to "give breaks" to other employees. This meant that she had to cover other employees' responsibilities while they took breaks. Stallworth's Dep. at 39–40. She further contends that, while she complained to Assistant Manager Willie Morgan ("Morgan") about her work conditions, he did not help her.

On the day she resigned, she went home before her shift was over, following a stressful conversation with Robinson. She called Morgan an hour later that day and told him that she was resigning because she was unhappy. She did not tell any other manager or supervisor why she was resigning. She signed an "Exit Interview" form, dated June 29, 1993, and indicated that she voluntarily terminated her employment for personal reasons. She did not write any comments in the section entitled "explanation of termination."

Before June 29, Stallworth had not told anyone that she was going to resign, and never told any manager that she would have to resign if changes were not made. She also did not think that she was going to be involuntarily terminated at the time of her resignation. No manager threatened to terminate her or encouraged her to resign. Likewise, no manager ever said that he or she wished Stallworth would resign and no manager expressed pleasure when she resigned. Stallworth never received any bad performance evaluations, was never written-up, demoted or placed on suspension or probation, and had never received a pay cut. During her three-year employment at Wal–Mart, she was never the recipient of any

racially-oriented language, obscenities or profanity. Moreover, Stallworth asserts that she first called the home office to complain about scheduling problems she was having in June and July 1992 but never called the home office to complain about anything in 1993.

Stallworth also claims that she should have been awarded the Department Manager position in the Domestics Department, which was awarded to Faye Bell ("Bell"), a white female. This position was an hourly position. Stallworth's own testimony regarding her interest in this position is contradictory. In her declaration, she states that she told outgoing Department Manager, Marie Hazelwood ("Hazelwood"), that she was interested in her position. Her deposition, on the other hand, is different:

> Q. In fact, you never told her that you were ... interested in the position, but that you were thinking about it, right?
>
> A. That's what I told her.
>
> . . . . .
>
> Q. Did you, in fact, at that time want to be considered for the position?
>
> A. I did but I wasn't going to let [Hazelwood] know.

Stallworth's Dep. at 79 & 83.

Around January 1993, Stallworth asked that her hours be reduced to no more than twenty-eight hours per week because she was going to school. Department Managers are full-time employees who work between thirty-five and forty hours per week. In May 1993, Stallworth learned that Bell had received the Department Manager position in the Domestics Department. Barnes was in charge of filling this position. In making his decision, Barnes states that he considered capability and past performance with Wal–Mart and also relied upon input from the assistant managers. The assistant managers were unanimous in their recommendation of Bell for the position.

In Barnes' opinion, Bell's superior past performance as a Department Manager rendered her most qualified. Bell had been employed with Wal–Mart for nine years and had been a Department Manager for more

than three and a half years. When the Department Manager position in domestics became vacant, she had worked as the night receiving supervisor for more than two years. Barnes, on the other hand, states that Stallworth had been employed by Wal–Mart for three years and never before had been a Department Manager.

Barnes states that he analyzed Bell's personnel file and discovered that she had performed successfully in Department Manager positions at Wal–Mart. Bell had received "above average" ratings on most of her performance evaluations, and had received five commendations for excellent performance. Stallworth concedes that it would not have been unreasonable for Wal–Mart to consider the length of experience at Wal–Mart and Department Manager experience.

Barnes asserts that he did not consider Stallworth for the position because he did not know that she was interested in it. Barnes had just arrived at the store in the beginning of May 1993 and Stallworth was working in the Men and Boys Department. According to Barnes, he would have awarded the position to Bell even if he had known that Stallworth had been interested because of Bell's qualifications in terms of successful Department Manager experience with Wal–Mart.

Barnes states that when he arrived, there were fourteen black and eight white department managers. He further states that throughout the time he was the store manager, there was a racially balanced mix of Department Managers. Wal–Mart further asserts that Stallworth failed to implement the Open Door policy at Wal–Mart after the Department Manager position had been filled.

### 2. Conclusions of Law

#### (a) Constructive Discharge

██ Under *Hill, supra* at 808, the court finds that Stallworth has failed to raise a genuine issue of material fact as to her constructive discharge claim. First, Stallworth has failed to allege a continuous pattern of discriminatory treatment. *See Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir.1990), *cert. denied*, 502 U.S. 815, 112

S.Ct. 66, 116 L.Ed.2d 41 (1991). The events that form the basis of her constructive discharge claim are limited to the following: (1) the denial of a promotion to Manager of the Domestics Department; (2) being overworked for the one-year period she was in the Men and Boys Department; (3) and generally unfair treatment and unwarranted criticism from Robinson, who is black.

In finding Stallworth's constructive discharge claim legally insufficient, the court adopts the same reasoning set forth in denying Hart's claim for constructive discharge. In sum, Stallworth has failed to show that the treatment she received constitutes "aggravating factors" sufficient to make out a claim of constructive discharge. *See Boze*, 912 F.2d at 804–06 (holding that unwarranted criticism, probation and poor performance evaluations are not constructive discharge as a matter of law). Additionally, Stallworth has failed to present any comparative evidence showing that white employees received better treatment. As such, Stallworth has not shown that the treatment accorded her was based on race. Accordingly, the court finds that Wal–Mart's motion for summary judgment as to Stallworth's constructive discharge claim is due to be granted.

#### (b) Denial of Promotion

Wal–Mart does not dispute that Stallworth is a member of a protected class, was objectively qualified for the position of Department Manager, was denied the promotion despite her qualifications and that Bell, a white employee, with comparable qualifications was selected instead of Stallworth. *See Perryman*, 698 F.2d at 1142 n. 7 (setting forth the elements to establish a prima facie case of race discrimination in the denial of a promotion).

Wal–Mart asserts, however, that Stallworth cannot make out a prima facie case, because she did not apply for the position. Stallworth's testimony is, in and of itself, contradictory as to whether she expressed an interest in the position. Nonetheless, the court finds that it need not determine whether she "applied": Even assuming that Stallworth can adduce sufficient evidence of a prima facie case, the court finds that Stall-

worth has failed to show any evidence of pretext.

■ Bell's superior experience, as asserted by Wal–Mart, is a legitimate reason for selecting one employee over another. *Smith v. Horner,* 839 F.2d 1530, 1538–39 (11th Cir. 1988). The evidence reveals that Barnes considered capability and performance history, which entailed considering the employees' work experience at Wal–Mart. The record reveals that Wal–Mart's decision to promote Bell over Stallworth was based upon a comparison of the following qualifications: Bell had been employed by Wal–Mart for nine years when the decision was made and Stallworth had been employed for three years. Bell had been a successful Department Manager for more than three-and-a-half years and was the night receiving supervisor for more than two years. Stallworth, on the other hand, had never been a Department Manager and had never held any supervisory position. Bell also had performed successfully as a Department Manager, as revealed by her performance evaluations.

■ The absence of evidence of pretext in Stallworth's case is obvious. The court finds that Wal–Mart used legitimate criteria and selected who it thought best satisfied such criteria. Stallworth even concedes that it would not have been unreasonable for Wal–Mart to consider Wal–Mart experience and prior department manager experience when making its decision. Where, as here, "an employer selects the person it believes is best qualified, an argument of pretext ordinarily will fail." *Smith,* 839 F.2d at 1538.

Additionally, the involvement of a black assistant manager (Morgan) in the decision-making process and his specific recommendation of Bell further weakens Stallworth's case. *See Moulds,* 935 F.2d at 256. The fact that there was a racially-balanced mix of Department Managers throughout the store also calls into doubt Stallworth's claim. *Id.* (Plaintiff not discriminatorily denied Department Manager promotion where several other blacks held Department Manager positions). As already stated herein, in May 1993, there were fourteen black and eight white Department Managers. Stallworth even identified thirteen black employees who had been Department Managers at one time during her employment.[24] Hence, in sum, the court finds that Stallworth has not presented evidence that Wal–Mart's asserted reason is false or that race played a part in its decision to deny her the promotion. Accordingly, summary judgment as to Stallworth's failure-to-promote claim is due to be granted.

## H. Stephanie Shields

### 1. *Findings of Fact*

Stephanie Shields ("Shields"), a black female, has been employed at Wal–Mart since March 1992. Shields presently works in the cash office and previously was a sales associate in the Domestics Department from March 1992 to July 1993. Shields brings her race discrimination claim under two theories. First, Shields asserts that Wal–Mart denied her a promotion on or about May 15, 1993, to Department Manager in the Domestics Department. Second, Shields asserts a hostile work environment claim.

The Department Manager position was awarded to Faye Bell ("Bell"), a white female, and is the same denial of promotion of which Stallworth complains. Wal–Mart's asserted reasons for selecting Bell is discussed *supra* and need not be repeated here.

Shields asserts that she was more qualified than Bell because she was familiar with the Domestics Department and Bell was not. She states that when she approached Assistant Manager Randy Maske ("Maske") about the position, he told her that she had not been with the company long enough.

Shield also asserts that the denial of promotion and Wal–Mart's change in her work schedule make up a claim for a hostile work environment based upon race. After she was denied the promotion in the Domestics Department, Maske changed her schedule from the day shift to the night shift. She claims

---

**24.** Stallworth's claim clearly is distinguishable from Easter's failure-to-promote claim. Easter's qualifications were so overwhelmingly superior to the employee selected for the promotion. Here, that is not the case.

that she had previously been promised the daytime shift by Mark Ferris, the former Store Manager. She complained to Maske, and Maske told her that he placed an elderly white female named Winnie Honeycutt in her place because she could not drive at night. The schedule change occurred in June 1993, and Shields was returned to a daytime shift when she moved to the cash office in July 1993.

### 2. Conclusions of Law

Wal–Mart concedes for purposes of ruling on the summary judgment motion that Shields has established a prima facie case of race discrimination in the denial of a promotion. Wal–Mart's legitimate non-discriminatory reason for not promoting Shields is that Bell was better qualified. As evidence of pretext, Shields asserts that she possessed superior qualifications. She also points to Maske's comment that she was denied the promotion because she had not been with the company long enough. Shields concludes that the comment is purely pretextual because the *Wal–Mart Associate Handbook* does not mention seniority as a criterion for receiving a promotion.[25]

■■■■■ Shields' allegations of superior qualifications simply are not supported by the record. The record reveals that Bell had several years of supervisory experience with Wal–Mart, while Shields had only been employed for one year, with no supervisory experience. Bell had an exceptional performance history, and Shields has not disputed Wal–Mart's evidence that performance history was a criterion that ultimately led to the selection of Bell. Shields does not challenge Bell's qualifications, but merely states that Bell had to be trained for the position. Even if Bell required training in order to become familiar with the Domestics Department, that does not constitute evidence of discrimination as there is no proof that some type of training for an individual promoted to a different position at Wal–Mart was out of the ordinary. *See Durham*, 18 F.3d at 840. Additionally, Shields' allegation that she would

not have needed training is conclusory. As the court has stated throughout this opinion, unsubstantiated allegations cannot create a "genuine issue of fact" and, thus, cannot defeat a motion for summary judgment. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

■■■■ Shields' evidence simply is inadequate to refute Wal–Mart's bona fide reason for not promoting her. At the very most, Shields has attempted to show that Wal–Mart's reason is false. However, "[m]erely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent. . . ." *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987). In sum, the court finds that Shields has failed to show that race motivated Wal–Mart's decision not to promote her and, thus, finds that summary judgment is due to be granted as to Shields' denial of promotion claim.

### 3. Hostile Work Environment

■■■■ Shields' hostile work environment claim fares no better. Her claim of racial harassment is based upon a single incident involving her schedule. As discussed at length, *supra*, a single incident does not constitute severe and pervasive harassment. Accordingly, summary judgment is due to be granted as to this claim.

## I. Clara Robertson

Clara Robertson ("Robertson"), a black female, has been employed at Wal–Mart since May 1986. She claims that she was demoted in March 1993 from a Department Manager position because of her race in violation of Title VII and § 1981. Additionally, Robertson claims that Artie Moore ("Moore"), a store co-manager, created a racially hostile work environment in violation of Title VII by constantly harassing her.

Robertson asserts that in 1989 or 1990, she complained to the Home Office about the disparity in promotions among blacks and whites. It is undisputed that in July 1992,

---

**25.** The July 1991 handbook states that "Opportunity comes quickly in a growing company. . . . Promotions are based on the Company's needs as well as individual skills, performance history and capability."

Wal–Mart offered, and Robertson accepted, a promotion to the position of Department Manager over the Furniture and Curtains Section of the Domestics Department. Cathy Robinson ("Robinson"), a white female, and Willie Morgan ("Morgan"), a black Assistant Manager, decided to promote Robertson. Robertson took over the duties of Department Manager from Marie Hazelwood, a white female. Prior to this time, Robertson had worked as a sales associate in the Domestics Department.

As Department Manager, Robertson was responsible for ordering and displaying merchandise and ensuring that her department was fully stocked. Her responsibilities also included keeping the department "zoned" (i.e., clean) and keeping the aisles free of freight. Ferris Decl. at ¶ 3. Wal–Mart asserts that Robertson's performance as Department Manager was unsatisfactory. According to Wal–Mart, her department was regularly out of stock and unclean. Additionally, Wal–Mart asserts that there often was freight in the aisles and that the overall condition of her department consistently was below Wal–Mart standards.

On January 12, 1993, Robertson verbally was counseled by Moore about the conditions of her department. Moore asserts that he told Robertson that he would help her set up her modular (a program for displaying merchandise on shelves and counters) and make sure that she had all the supplies she needed but that thereafter maintaining the department was her responsibility.

On January 22, 1993, Assistant Manager Randy Maske ("Maske") counseled Robertson about working off the clock, a violation of Wal–Mart policy. On that same day, Robertson was again counseled by Maske for leaving early on a Friday because she had worked all of her allotted hours during the first part of the week. On February 9, 1993, Robertson received another verbal counseling from Maske. At this time, Robertson was told that her performance was not up to expectations and that the situation would be reviewed in two weeks to decide whether a change would be made in her position. She also was given specific instructions as to what needed to be done to improve her department.

On March 2, 1993, Ferris, Moore and a racially-mixed group of assistant managers removed Robertson from the Department Manager position and moved her to a sales associate position in the Infants Department. Robertson did not receive a reduction in her hourly wage or benefits as a result of the transfer. Faye Bell ("Bell"), a white female, replaced Robertson as Department Manager. Bell had previously been the Department Manager in the Infants and Girls Departments. Bell was later replaced by Glenn Jackson, a black male.

Robertson also claims that Moore harassed her because she is black. Specifically, she alleges that he subjected her to excessive and unwarranted criticism. In her complaint, Robertson asserts that Moore harassed her by being in her department 30% to 40% of the time. At her deposition, however, Robertson stated that she did not consider this an unusual amount of time for a co-manager to spend in a particular department. She does assert that when Moore was in her department, he would harass her by asking her why she was out of stock.

Robertson differentiates Moore's behavior from that of other managers by stating that Moore constantly would point out to her where she had done things wrong. If she disagreed with him, Moore would sometimes raise his voice. Moore never cursed.

Robertson explained at her deposition that Moore would often use the word "segregate" in a racially derogatory manner:

Q. Did he ever call you any racially derogatory names?

A. No. Just the part where he used "segregate" in rephrasing to different things. If he wanted me to do something, instead of saying "separate this", he would use the "segregate this."

Q. Segregate the white towels from the red towel?

A. Yes. He would say well, "segregate these chairs then segregate these chairs" because I was in the Furniture Department.

Q. And you consider that a racial—

A. I found it offensive.

Q. Derogatory, racially offensive?

A. Right, I did.

Q. If he'd said separate the red chairs from the white chairs, that would have been okay?

A. I would have felt better about that.

Robertson's Dep. at 86.

Robertson also claims that Moore treated white employees better than she was treated but supports this statement only by saying that the white employees "seemed" happy based on their outward appearance. Robertson, however, never talked to white employees about how Moore treated them and does not know how he treated employees in other areas of the store:

Q. ... Is it your testimony that Artie Moore did not, quote, follow behind white department managers?

A. I work on one side of the store. I have not noticed him doing it.

Q. You were pretty well in your department, weren't you?

A. Yes.

Q. Although it's your testimony that Mr. Moore spent for several months nearly all of his time in your department?

A. He spent quite a bit of time in that department up until the time I was demoted.

Q. Did he spend any time in other departments?

A. I'm quite sure he did. He was a co-manager and he was getting familiar with the store because he was looking to have his store one day.

*Id.* at 115–16.

At the same time Robertson was demoted, Moore also demoted a white female, Jennifer Dorman ("Dorman"), from a Department Manager position over the Claims Department to a sales associate. According to Dorman, Moore spent a great deal of time in her department, "checked behind" her even when she told him she had already done something and always let her know when she had done something wrong. Dorman's Decl. at ¶ 2. Wal–Mart asserts that, like Robertson, Dorman's performance as Department Manager did not meet Wal–Mart standards. As such, Dorman similarly was demoted to a sales associate position.

Robertson testified about several instances where blacks replaced whites as Department Managers. She further testified that there were more black Department Managers than white Department Managers when the store opened and that she did not know what the racial balance was after her demotion. In May, 1993, only two months after her demotion, there were fourteen black and eight white Department Managers.

The management team, which consists of black and white employees, discussed the decision to remove Robertson from the Department Manager position. Morgan agreed with all the other members of the management team that Robertson should be removed from the Department Manager position because of the substandard condition of her department.

### 2. Conclusions of Law

#### (a) Demotion

In order to prove a prima facie case of discriminatory demotion, Robertson must prove by a preponderance of the evidence that: (1) she is a member of a protected group; (2) an adverse employment action was taken against her; (3) she was replaced by a person outside the protected group; and (4) she was qualified for the position in question. *Pace v. Southern Railway System,* 701 F.2d 1383, 1385 (11th Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983).

Robertson is black, was demoted and replaced by a white employee, thus, satisfying three elements of her prima facie case. Contrary to Wal–Mart's assertion, the court likewise finds that Robertson has created a genuine issue of material fact about whether she was qualified for the position. Wal–Mart has presented evidence that Robertson received several disciplinary write-ups and failed to keep her department in compliance with Wal–Mart standards. Hence, at first glance, it appears that based upon her past history of work performance, she was not qualified to remain in the position of Department Manager.

■ While Robertson's evidence is admittedly tenuous, the court nonetheless finds that a jury *possibly could* infer that Wal-Mart attempted to thwart her performance in an effort to oust her from the position. Whether or not the jury would, in fact, find discrimination in this instance is not the issue: In analyzing a discrimination claim on a motion for summary judgment, the court's "inquiry is whether an ordinary person could reasonably infer discrimination if the facts presented remained unrebutted." *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996) (citations omitted). That is, based upon Robertson's complaint to the Home Office, a jury *possibly could infer* that Robertson's promotion was a "sham." A jury further *could* infer that after promoting her, Wal-Mart attempted to oust her from this position by not giving her a "moment's peace, and no real chance to prove herself as [D]epartment [M]anager." Pl.'s Br. in Opp. Mot.Summ.J., filed Nov. 28, 1995, at 7. For instance, Robertson has testified that management would not allow her to work at night on modulars, and that other Department Managers were so allowed. The fact that placement of merchandise was one reason advanced for demoting Robertson suggests that management may have attempted to impede her efforts.

If this is the case, Wal-Mart certainly should not be able to succeed on an argument that Robertson was not qualified for a position as Department Manager. The facts here are, thus, clearly distinguishable from the line of cases that holds that a plaintiff cannot establish a prima facie case of discrimination when discharged for poor performance. Those cases contained no evidence that the employer may have attempted to prevent the plaintiff from performing satisfactorily. *See Richmond v. Board of Regents of University of Minnesota*, 957 F.2d 595, 598 (8th Cir.1992); *Spiller v. Ella Smithers Geriatric Center*, 919 F.2d 339 (5th Cir.1990).

■ The burden now shifts to Wal-Mart to show a legitimate, non-discriminatory reasons for demoting Robertson. Wal-Mart asserts that Robertson's unsatisfactory job performance led to her demotion. The court finds that when viewing the evidence in the light most favorable to Robertson, Wal-Mart's asserted reason simply is not legitimate. As already discussed, Robertson has presented evidence that suggests that the only reason her performance was poor is because Wal-Mart thwarted her performance. Thus, the court finds that Wal-Mart has failed to sustain its burden. Accordingly, summary judgment is due to be denied as to Robertson's demotion claim.

### (b) Hostile Work Environment

■ The basis of Robertson's claim for hostile work environment is that Moore scrutinized her work and pointed out her shortcomings on a regular basis. The court finds, as a matter of law, that the conduct complained of, unaccompanied by any racially opprobrious language or conduct, does not approximate the severity required to state a claim for a hostile work environment. In addition, Robertson has not presented any comparative evidence showing that the treatment accorded Robertson was different than that accorded similarly-situated white employees. Robertson simply has not shown that but for the fact of her race, she would not have been the object of harassment. As previously stated in this opinion, "Title VII is not a shield against harsh treatment in the workplace." *Nix*, 738 F.2d at 1187 (11th Cir.1984). In fact, the evidence reveals that the Moore's treatment of Dorman is strikingly similar to that directed toward Robertson. The law is clear that there is no hostile work environment claim when the alleged harassing behavior of a supervisor is borne equally by employees of all races. *Hill v. K-Mart Corp.*, 699 F.2d 776, 778 (5th Cir.1983) (No racial or sexual harassment where manager treated all assistant managers with "measured disdain."). Accordingly, the court finds that Wal-Mart is entitled to summary judgment on Robertson's racial harassment claim.

### (c) Denial of Promotion

■ Robertson's denial of promotion claim also must fail because she has failed to identify a promotion which she was denied. Robertson testified at her deposition that the only promotion she sought which she did not

receive was in 1987. Any claim based on this promotion clearly is time-barred. Robertson attempts to salvage her claim by alleging that her promotion to the Department Manager position in July 1992 was a "sham." A claim, however, cannot lie because the fact is that she did receive this promotion and served in this position for almost eight months. Accordingly, summary judgment is due to be granted as to Robertson's promotion claim.

## CONCLUSION AND ORDER

In accordance with the foregoing opinion, it is CONSIDERED and ORDERED as follows:

(1) that Wal–Mart' motion for summary judgment as to Kumasi Mants' cause of action be and the same is hereby GRANTED in part and DENIED in part; [26]

(2) that Wal–Mart's motion for summary judgment as to Calandra Cherry's claims be and the same is hereby GRANTED;

(3) that Wal–Mart's motion for summary judgment as to Corey Crawford's cause of action be and the same is hereby DENIED;

(4) that Wal–Mart's motion for summary judgment as to Caroline Glover's cause of action be and the same is hereby GRANTED in part and DENIED in part; [27]

(5) that Wal–Mart's motion for summary judgment as to Charlotte Hardy's cause of action be and the same is hereby GRANTED;

(6) that Wal–Mart's motion for summary judgment as to Lola Nowden's cause of action be and the same is hereby GRANTED;

(7) that Wal–Mart's motion for summary judgment as to Clara Robertson's cause of action be and the same is hereby GRANTED in part and DENIED in part; [28]

(8) that Wal–Mart's motion for summary judgment as to Twalla McCree's cause of action be and the same is hereby GRANTED;

(9) that Wal–Mart's motion for summary judgment as to Melba Easter's cause of action be and the same is hereby DENIED;

(10) that Wal–Mart's motion for summary judgment as to Aurelia Hart's cause of action be and the same is hereby GRANTED;

(11) that Wal–Mart's motion for summary judgment as to Terri Howard–Stallworth's motion for summary judgment be and the same is hereby GRANTED;

(12) that Wal–Mart's motion for summary judgment as to Stephanie Shield's cause of action be and the same is hereby GRANTED.

26. Kumasi Mants' claim for race discrimination in his termination survives summary judgment, but he has failed to raise a genuine issue of material fact regarding his race discrimination claims for hostile work environment and denial of promotion.

27. The court denies summary judgment as to Caroline Glover's termination claim based upon sex and grants summary judgment as to Caroline Glover's race discrimination cause of action.

28. Clara Robertson has presented a genuine issue of material fact regarding her demotion claim based upon race. The court grants summary judgment on all other claims.